IRA BENAMIN KATZ (State Bar No. 81007)
LAW OFFICES OF IRA BENJAMIN KATZ, a Prof. Corp.
1925 Century Park East, Suite 1700
Los Angeles, CA 90067
Phone (310) 282-8580
email: ikatz@katzlaw.net
[Proposed] Co-Counsel to the Debtor and Debtor in Possession

DAVID W. MEADOWS (State Bar No. 137052)
LAW OFFICES OF DAVID W. MEADOWS
1801 Century Park East, Suite 1235
Los Angeles, California  90067
Tel : (310) 557-8490
Fax : (310) 557-8493
Email: david@davidwmeadowslaw.com
[Proposed] Co-Counsel to the Debtor and Debtor In Possession

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
(LOS ANGELES DIVISION)

| In re | Case No. 2:17-bk-13943-ER |
|---|---|
| UNITY COURIER SERVICE, INC., | Chapter 11 |
| Debtor and Debtor in Possession | **DECLARATION OF LOUIS LIPSON IN SUPPORT OF FIRST DAY MOTIONS** |
| | Hearing:       April 6, 2017<br>Time:          3:00 p.m.<br>Place:         Courtroom 1568<br>                  255 East Temple Street<br>                  Los Angeles, CA  90012 |

1

**I, Louis Lipson, declare as follows:**

1.      I am the Controller of Unity Courier Service, Inc., the Chapter 11 debtor and debtor in possession in the above-entitled bankruptcy proceeding (the "Debtor").    I have authority to make this declaration on the Debtor's behalf, pursuant to that "Statement Regarding Authority to Sign Chapter 11 Petition on Behalf of Unity Courier Service[1]."    I have personal knowledge of the facts set forth herein, except as to those stated on information and belief and, as to those, I am informed and believe them to be true.  If called as a witness, I could and would competently testify to the matters stated herein.

2.      This declaration is made in support of the Debtor's following first day, omnibus motion (the "Motion"):

A)      Authorizing the Debtor Pursuant to Section 105(a), 362, 363(b), 507(a), 1107(a) and 1108 of the Bankruptcy Code to Pay Prepetition Wage and Compensation, And Related Relief; Memorandum Of Points And Authorities In Support Thereof (the "Wage Related");

B)      Authorizing the Debtor Pursuant To Sections 105(a), 363(b), 503(b) And 507(a) of the Bankruptcy Code, to Permit the Retention of Certain Pre-Petition Bank Accounts (Merchant and ACH Accounts and Credit Line Account)" (the "Banking Related");

C)      Authorizing the Debtor Pursuant to Section 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b) For Authority To Use Cash Collateral and Provide Replacement Liens (the "Cash Collateral Related"); and

D)      Authorizing the Debtor Pursuant to Section 364(b) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(c) For Authority to Continue a Credit Line in Place with Community Bank and/or to Obtain a New Credit Line Unsecured by Assets of the Debtor, but Secured by

---

[1]     See Petition package, Docket No. 1, page 5.

Assets of the Debtor's Sole Shareholders, Larry Lum and Ali Sharifi, to the Extent, if any, Not Automatically Authorized Pursuant to Section 364(a) as Ordinary Course ("Ordinary Course Borrowing Related").

### Events Preceding the Bankruptcy

3.    Founded in 1984, the Debtor is a courier service specializing in scheduled route services as well as on-call transportation needs. Customers include many major banking and financial institutions, retail establishments, professional organizations and numerous other businesses.  The Debtor has more than 800 employees working out of its 12 offices in California and Washington and utilizes subcontractors in Arizona, Colorado and Nevada.

4.    The Debtor's case was filed due to an inability to reach a settlement with claimants in a class action for unpaid wages.   In 2008, the Debtor acquired certain assets of Trans-box Systems, a decades old courier service that was failing. In June, 2013, judgment was entered against the Debtor on a successor liability theory, in the amount of $3,862,372.05, plus interest, attorneys' fees and costs. That judgment is on appeal.  The class action plaintiffs will be referred to by the Debtor as the "Brooks Class" and the "Brooks Class Claimants."  The Debtor is informed and believes that the Brooks Class assert a judicial "ORAP" lien against all assets of the Debtor.  Although such lien, if enforceable, was obtained during the 90 day period pre-Petition, and the Debtor believes whatever lien held by the Brooks Class Claimants is avoidable under Section 547 of the Bankruptcy Code, this omnibus Motion treats the Brooks Class Claimants as having a secured claim, without determination of its valuation as a secured claim relative to the Debtor's assets and senior liens.

5.    Due to an inability to reach a settlement with the Brooks Class Claimants and pending litigation deadlines, the Debtor filed its voluntary petition on March 31, 2017 (the "Petition Date").

## WAGE AND COMPENSATION RELATED PORTION

## OF THE OMNIBUS MOTION

6.        The Debtor pays its employees every two weeks in arrears one week after close of the payroll period.  The most recent payroll (including the payments to the independent contractors) was made on March 24, 2017.  The next payment is due on April 7, 2017.  The April 7th payment will include wages and independent contractor obligations accrued during the two weeks prior to the March 31, 2017 date the Petition Date, plus any obligation for services that were rendered on the Petition Date, but after the 2:55 p.m. filing.  The payment obligations identified on **Exhibit 1**[2] are merely the ordinary payment obligations that are accrued in the two weeks before, and on the day of, but after, the filing, but are due to be paid the week after the filing.

7.        To avoid the irreparable harm to the Debtor's estate if the Debtor was not able to retain its workforce, the Debtor seeks authority to pay certain prepetition claims for, among other things, wages and salaries of non-insiders and other compensation including federal and state withholding taxes, payroll taxes, which the Debtor pays or provides to the employees in the ordinary course of business (collectively, the "Employee Obligations").   In addition, the Debtor requests authority to pay to the appropriate third parties the amounts that are deducted and withheld from employees' paychecks (the "Employee Deductions").    The Debtor further requests authorization to pay and/or honor compensation related checks that are remaining outstanding and not cashed but only those held by current employees.   In addition, way of this Motion, the Debtor seeks authority to pay or honor, Employee Obligations and Employee Deductions in respect to the Debtor's Employees as of the Petition Date, and to continue to honor existing Employee practices, programs and policies.

---

[2]        All Exhibits are attached hereto, and are listed at the end of this Declaration.

8.    As of the Petition Date, the Debtor employs over 800 individuals.    The total payments that are due or are coming due are shown on Exhibit 1[3]. Exhibit 1 sets out the data for each individual.    The anticipated totals are shown at the bottom of Exhibit 1, and are as follows:

| | |
|---|---|
| Total Expected Payments to employees and independent contractors | $1,064,976.41 |
| Total Payroll Tax, State and Federal Withholding: | $239,787.43 |
| Expected garnishments: | $3,243.05 |
| Outstanding paychecks | $113,452.97 |
| Total Expected Pre-Petition Payroll Related Expenses: | $1,421,459.86 |

In addition, since the actual payroll amounts are based on the actual deliveries made per courier, the final amounts may vary slightly.  To account for that variation, I request approval of up to an additional $25,000 as cushion.  Therefore, the total amount requested for approval is: **$1,446,459.86.**

9.    In all instances, no employee will be paid more than $12,850.00 which I understand is the amount of the Bankruptcy Code section 507(a)(4) priority for unsecured wage, salaries, or commissions, including vacation, severance and sick leave claims earned by an individual within 180 days prior to the filing of the petition..

10.    In the ordinary course of business, the Debtor takes employee deductions from its employees' paychecks (as applicable) that include payroll taxes and the employees' portion of FICA and unemployment taxes. The Debtor forwards amounts equal to the employee deductions from its operating account to the appropriate third-party recipients.

---

[3]    Certain employees are listed more than once on Exhibit 1 because they have multiple claims which, in the aggregate do not exceed $12,850.  These are not duplicate amounts.

11.     It would cause immediate and irreparable harm to the Debtor and its business operations unless it is authorized to continue its ordinary business operations by maintaining its employee related wage and salary obligations, and it would cause great and unnecessary hardship to the employees and independent contractors.

12.     As set forth in Exhibit 1, the total expected payroll is $1,421,459.86.  The Debtor anticipates having sufficient funds on hand on April 7, 2017 to meet its payroll obligations.  As of the filing of the petition, the Debtor had approximately $3,264,436 in what it believes are collectible accounts receivables and approximately $23,017 in cash on hand.  The Debtor collected approximately $ 187,000 of the prepetition receivables on April 3.  The Debtor expects to have approximately an additional $1,100,000 in collectible accounts receivable as of April 4, 2017 for new April billings.  Historically, to the extent there were insufficient funds on hand as of a pay date, in the ordinary course of its business, the Debtor would normally draw down on its $750,000 credit facility from Community Bank (the "Credit Line") to cover its payroll obligations and then pay down or pay off that line as funds became available.  As of the filing of the petition for relief, the Credit Line had been paid down to zero.  However, I do not yet know whether Community Bank will continue to provide that Credit Line post-petition.  The Credit Line is not secured by assets of the Unity, but, I am informed and believe, is secured by certificates of deposit posted by Larry Lum ("Lum") and Ali Sharifi ("Sharifi"), the sole officers, directors, and shareholders of Unity.  It is my understanding that if the Debtor does not have sufficient funds on hand to make payroll on the pay date and Community Bank will not extend credit under the Credit Line that the Debtor will have an alternative credit facility in place on substantially identical terms and will draw upon that line, as needed, in the ordinary course.  This is further evidenced by the Declaration of Larry Lum filed concurrently herewith.  The Debtor will not issue checks to employees on April 7th unless approved by this Court and it has funds on hand to cover the checks.

### Request to Preserve Pre-Petition Bank Account

The Debtor maintained the following accounts pre-petition, all held at Community Bank:

a)    Money Market Account:    The Debtor deposits customer checks into this account. Money is then transferred manually to cover any disbursements from the Disbursement Account, Payroll, Account or the Credit Line. This account **was closed** on March 31, 2017, once the Petition was filed.

b)    Disbursement Account:    This account is for the payment of ordinary course payments plus outgoing ACH payments to vendors.   Some taxes are paid from this account but not the IRS.   This account is funded by draws on the Credit Line.   This account **was closed** on March 31, 2017.

c)    EFT Account:    This account processes both ACH transfers and functions as a merchant bank account for credit card payments.   The Debtor mostly transfers funds from this account to the Credit Line.   This account has **not** been closed, for the reasons stated below and in the Motion.

d)    Payroll Account:    This account is for the payment of employee checks and the IRS.   This account is funded from either deposits into the Money Market Account or draws on the Credit Line.    Employees do not have direct deposit.  All payments are made by check.   This account **was closed** on March 31, 2017.

e)    Credit Line.   This account serves as a line to support the Debtor's payment obligations.   It is unsecured by any assets of the Debtor.  As of the Petition Date, it had been paid down to a zero balance.  This account was **not closed**, so that it can remain in place to cover any cash shortfall for the compensation payable on April 7, 2017.

13.     It is absolutely critical to the Debtor that the EFT Account is kept open until a new one at an approved depository can be opened.  The Debtor is still receiving funds into that account. Indeed, the Debtor received approximately $170,000 in post-petition payments to this account as of April 3, 2017. It will create chaos for the Debtor's customers if deposits into that account are refused.

14.     It is also absolutely critical for the Credit Line account to remain open to receive advance from Community Bank in the ordinary course of business until the Debtor sets up a similar unsecured credit line facility with another institution which it hopes to do within 30 days of the date of the hearing on the instant motion.

**Request for Use of Cash Collateral**

15.   Based on the Debtor's estimates, it has as of the Petition Date, Attached  hereto as **Exhibit 2** is a true copy of the Debtor's Estimated Assets and Liabilities as of March 31, 2017 Petition Date which reflects $4,018,608 in total assets and $3,749,428 in total liabilities.  This estimate does not reflect the judgment against the Debtor obtained in February, 2016 year by the Brooks Class in phase one of a class action lawsuit pending in the Alameda County Superior Court Case Number JCCP 004691/RG 08 401461 (the "Alameda Action" and the "Brooks Judgment") nor the claim asserted by the Brooks Claimants in phase 2 of the trial which I am informed was set to commence on April 25, 2017, but was stayed by the filing of the petition for relief herein.  I am informed that Brooks asserts that the outstanding unpaid balance of the Brooks Judgment exceeds $5,000,000. The Brooks Judgment is on appeal.  In light of the Brooks Judgment, the Debtor has been insolvent since at least 90 days prior to the Petition Date.

16.    As of the Petition Date, the Debtor had three creditors who may be secured by the Debtor's assets:

a.    Camco Resources, LLC ("Camco"),

b.    Steve Kelley Lopez ("Lopez"),

c.    and the Brooks Class.

17.    It is my understanding that Camco asserts a first priority security interest in all of the personal property of the Debtor by reason of the Debtor's purchase of certain assets from Camco's assignor memorialized by a Commission Agreement and a Security Agreement both entered into as or about March 21, 2013 and a UCC-1 Financing Statement filed with the California Secretary of State on January 21, 2016 which was assigned filing number 16-7505715300 (collectively, the "Camco Loan Documents"), a true copy of each is attached to the Stipulation for Use of Cash Collateral filed concurrently herewith as **Exhibits 3, 4, and 5,** respectively.  The Commission Agreement calls for the Debtor to pay to Camco a commission or royalty payment of between 2% and 5% of designated revenues for 120 months in an amount not to exceed $3,000,000.  As of the Petition Date, the unaudited, internal records of the Debtor indicate a commission balance owed to Camco of $1,236,683.54.  The Commission Agreement further provides for Ali Sharifi and Larry Lum to personally guaranty the Debtor's indebtedness thereunder and to provide a lien on three pieces of real property owned by them.

18.    It is my further understanding that Lopez asserts a second priority security interest in all of the personal property of the Debtor by reason of a $200,000 loan he made to the Debtor memorialized by a Promissory Note and a Security Agreement, both entered into on or about February 12, 2016, and a UCC-1 Financing Statement filed with the California Secretary of State on February 15, 2016 which was assigned filing number 16-7505715300 (collectively, the "Lopez Loan Documents"), a true copy of each is attached hereto to the Stipulation for Use of Cash Collateral filed concurrently herewith as **Exhibits 6,**

**7, and 8**, respectively.  As of the Petition Date, the unaudited, internal records of the Debtor indicate a balance owed to Lopez pursuant to the Lopez Loan Documents of $200,000, plus accrued interest. Although the Promissory Note to Lopez matured pre-petition, it is my understanding that Lopez has agreed to continue to accept interest only payments for a limited period of time.

19.    I am informed that an Order to Appear for Examination (the "ORAP") by the Brooks Class was issued in the Alameda Action on February 15, 2017, a conformed copy of which is attached hereto as **Exhibit 9**, and that, thereafter, the ORAP was sent for service upon the Debtor.  It is my understanding that pursuant to California Code of Civil Procedure section 708.110(d), "Service of the order creates a lien on the personal property of the judgment debtor for a period of one year from the date of the order unless extended or sooner terminated by the court."  It is my further understanding that if the ORAP was properly served upon the Debtor, such service could not have been until on or after the ORAP was issued on February 15, 2017, less than 90 days prior to the March 31, 2017 Petition Date at a time when the Debtor was insolvent and, accordingly, any such lien would be avoidable as a preference pursuant to Bankruptcy Code section 547.

20.    Attached hereto as **Exhibit 10** is my projection of the Debtor's cash receipts and disbursements during the months of April, May and June, 2017, if allowed to operate normally and use cash collateral.  On a cash basis, including its regular monthly commission payment to Camco (estimated to aggregate $108,753 during this three-month period) and interest only payment to Lopez (estimated to aggregate $4,930 during this three month period), I project that the Debtor will receive $11,421,814 and disburse a total of $11,331,762, during the months of April, May and June, 2017, leaving a cash balance of $90,051 at the end of this period.  It is my belief that the Debtor's continued operation during this three month period will not result in a diminution of the value of the cash collateral, but either the maintenance

or enhancement of the value of the cash collateral and a reduction in the amount owed to Camco.  Without

the use of cash collateral, the Debtor would not be able to operate.

### Ordinary Course, Unsecured Borrowing

21.    As set forth above, the Debtor has utilized an unsecured credit line.   It is critical to

the Debtor's continued operation and cash flows that the credit line facility remain open until it is replaced

by a new facility on similar terms, at an approved depository.  As stated above, the Debtor currently has

a $750,000 credit line at Community Bank.  The Debtor is undertaking to have a new, unsecured credit

line established at Citizens Business Bank.  These efforts are described in the separately filed Declaration

of Larry Lum.


I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Executed this _____ day of April, 2017 in Los Angeles, California.


see next page

_____
Louis Lipson

11

or enhancement of the value of the cash collateral and a reduction in the amount owed to Camco.  Without the use of cash collateral, the Debtor would not be able to operate.

### **Ordinary Course, Unsecured Borrowing**

21.      As set forth above, the Debtor has utilized an unsecured credit line.  It is critical to the Debtor's continued operation and cash flows that the credit line facility remain open until it is replaced by a new facility on similar terms, at an approved depository.  As stated above, the Debtor currently has a $750,000 credit line at Community Bank.  The Debtor is undertaking to have a new, unsecured credit line established at Citizens Business Bank.  These efforts are described in the separately filed Declaration of Larry Lum.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this __4th__ day of April, 2017 in Los Angeles, California.

Louis Lipson

## LIST OF EXHIBITS

**Exhibit 1:**          List of Wage Related Payments Requested for Approval

**Exhibit 2:**          Estimated Assets and Liabilities as of March 31, 2017

**Exhibits 3 – 5:**     Camco Loan Documents

**Exhibits 6 – 8:**     Lopez Loan Documents

**Exhibit 9:**          Brooks Class ORAP Order to Appear for Examination

**Exhibit 10:**         Projection of the Debtor's cash receipts and disbursements during the months of
April, May and June, 2017

EXHIBIT 1

**Unity Courier Service**
**Expected  Payroll to be Paid 4/7/17**
**for the payroll period ended 3/31/17**

| Payment Date | Payment Amount | Last Name | First Name |
|---|---|---|---|
| 07-Apr-17 | $1,068.60 | Zuniga | Aracely |
| 07-Apr-17 | $88.00 | Zuniga | Aracely |
| 07-Apr-17 | $961.31 | Zulkarnaen | Aviana |
| 07-Apr-17 | $947.09 | Zendejas Jr | Jose Luis |
| 07-Apr-17 | $571.41 | Zendejas Jr | Jose Luis |
| 07-Apr-17 | $1,011.62 | Zednick | Deborah |
| 07-Apr-17 | $1,431.13 | Zavalza | Nancy |
| 07-Apr-17 | $1,265.69 | Zavala | Sixto |
| 07-Apr-17 | $1,338.84 | Zantsevich | Valery |
| 07-Apr-17 | $1,555.40 | Zamora Barron | Alex |
| 07-Apr-17 | $888.87 | Zamora | German |
| 07-Apr-17 | $898.15 | Zambrano | Karol |
| 07-Apr-17 | $1,280.80 | Zaldivar | Concepcion |
| 07-Apr-17 | $1,185.59 | Yang | Ma Dee |
| 07-Apr-17 | $720.65 | Yang | Long |
| 07-Apr-17 | $688.67 | Yang | Kevin Hua |
| 07-Apr-17 | $458.88 | Yang | Cynthia |
| 07-Apr-17 | $680.31 | Yang | Cheemo Blia Tou |
| 07-Apr-17 | $1,462.21 | Yanez | Palemon |
| 07-Apr-17 | $910.06 | Xiong | Long |
| 07-Apr-17 | $1,308.76 | Xiong | Caleen |
| 07-Apr-17 | $1,760.54 | Wu | Louis |
| 07-Apr-17 | $1,536.36 | Wright lll | Gene |
| 07-Apr-17 | $815.76 | Windau | Warren |
| 07-Apr-17 | $1,332.82 | Wilson | Carol |
| 07-Apr-17 | $999.95 | Willey | Stephanie |
| 07-Apr-17 | $557.65 | Widhiarko | Josef |
| 07-Apr-17 | $599.10 | Widhiarko | Josef |
| 07-Apr-17 | $1,427.76 | Wenceslao | John |
| 07-Apr-17 | ($1,766.36) | Weiland | Jonathan |
| 07-Apr-17 | $1,437.31 | Weiland | Jonathan |
| 07-Apr-17 | $1,766.36 | Weiland | Jonathan |
| 07-Apr-17 | $1,020.68 | Weber Jr | Walter |
| 07-Apr-17 | $1,778.65 | Watson | Gary Lee |
| 07-Apr-17 | $35.76 | Watson | Gary Lee |
| 07-Apr-17 | $2,200.84 | Washington | Leroy |
| 07-Apr-17 | $50.00 | Wais | Safaa |
| 07-Apr-17 | $1,164.10 | Wais | Safaa |
| 07-Apr-17 | ($1,260.90) | Wais | Safaa |
| 07-Apr-17 | $1,260.90 | Wais | Safaa |

**Unity Courier Service**
**Expected  Payroll to be Paid 4/7/17**
**for the payroll period ended 3/31/17**

| Payment Date | Payment Amount | Last Name | First Name |
|---|---|---|---|
| 07-Apr-17 | $832.63 | Vue | Seng |
| 07-Apr-17 | ($832.63) | Vue | Seng |
| 07-Apr-17 | $872.21 | Vue | Seng |
| 07-Apr-17 | $832.63 | Vu | Quocanh |
| 07-Apr-17 | $1,927.18 | Vozniuk | Dmytro |
| 07-Apr-17 | $1,417.58 | Vo | Tu |
| 07-Apr-17 | $1,137.88 | Vital | Calixto |
| 07-Apr-17 | $2,306.62 | Virk | Jaswinder |
| 07-Apr-17 | $1,187.26 | Virk | Jaswinder |
| 07-Apr-17 | ($2,306.62) | Virk | Jaswinder |
| 07-Apr-17 | $1,501.40 | Virk | Jaskaran Singh |
| 07-Apr-17 | $668.47 | Virachit | Jamie |
| 07-Apr-17 | $166.48 | Villarreal | Adrian |
| 07-Apr-17 | $727.98 | Villareal | Miguel |
| 07-Apr-17 | $891.54 | Villanueva | Michelle |
| 07-Apr-17 | $875.88 | Villalta | Ana |
| 07-Apr-17 | $1,538.04 | Villalobos | Jose |
| 07-Apr-17 | $998.47 | Villalobos | Hugo |
| 07-Apr-17 | $579.80 | Villagomez | Jesus |
| 07-Apr-17 | $1,048.99 | Villachica | Maria Eugenia |
| 07-Apr-17 | $1,238.22 | Villa | Rafael |
| 07-Apr-17 | $971.51 | Villa | Irene |
| 07-Apr-17 | $2,002.17 | Vilchez | Jose |
| 07-Apr-17 | $1,342.42 | Vilash | Rakesh |
| 07-Apr-17 | $466.78 | Vianzon | Marciano |
| 07-Apr-17 | $1,967.25 | Vergara | Carlos |
| 07-Apr-17 | $1,182.26 | Vera | Gloria |
| 07-Apr-17 | ($1,182.26) | Vera | Gloria |
| 07-Apr-17 | $1,094.04 | Vera | Gloria |
| 07-Apr-17 | $951.07 | Ventura Rosales | Jhoan |
| 07-Apr-17 | ($845.44) | Velela | Marco Antonio |
| 07-Apr-17 | $552.63 | Velela | Marco Antonio |
| 07-Apr-17 | $845.44 | Velela | Marco Antonio |
| 07-Apr-17 | $1,009.44 | Velasquez | Santos |
| 07-Apr-17 | $785.86 | Velasco | Felipe |
| 07-Apr-17 | $971.40 | Vazquez-Ramirez | Jorge |
| 07-Apr-17 | $1,241.59 | Vazquez-Palafox | Nora |
| 07-Apr-17 | $1,545.27 | Vasquez | Liliana |
| 07-Apr-17 | $1,076.96 | Vasquez | Jaime |
| 07-Apr-17 | $1,589.46 | Vas | Eduardo |

**Unity Courier Service**
**Expected  Payroll to be Paid 4/7/17**
**for the payroll period ended 3/31/17**

| Payment Date | Payment Amount | Last Name | First Name |
|---|---|---|---|
| 07-Apr-17 | $1,502.59 | Vartanian | Arpineh |
| 07-Apr-17 | $1,138.52 | Vargas-Apolinar | Rossana |
| 07-Apr-17 | $966.61 | Vargas Garcia | Wilson |
| 07-Apr-17 | $933.48 | Vargas | Cesar |
| 07-Apr-17 | $1,032.21 | Vargas | Andrea |
| 07-Apr-17 | $1,332.98 | Vang | Shoua |
| 07-Apr-17 | $1,138.95 | Vallejo | Maria |
| 07-Apr-17 | $825.32 | Valle | William |
| 07-Apr-17 | $2,120.00 | Valenzuela | Gilberto |
| 07-Apr-17 | $1,174.31 | Valencia | Milwaerd |
| 07-Apr-17 | $2,538.88 | Ushakov | Aleksey |
| 07-Apr-17 | $2,287.52 | Ushakov | Aleksey |
| 07-Apr-17 | ($2,538.88) | Ushakov | Aleksey |
| 07-Apr-17 | $1,132.24 | Urena-Jara | Oscar |
| 07-Apr-17 | $30.17 | Turner | Charon |
| 07-Apr-17 | $690.30 | Turner | Charon |
| 07-Apr-17 | ($1,503.55) | Tuntaliyanon | Praripon |
| 07-Apr-17 | $1,708.67 | Tuntaliyanon | Praripon |
| 07-Apr-17 | $1,503.55 | Tuntaliyanon | Praripon |
| 07-Apr-17 | $295.55 | Trejo | Ramon |
| 07-Apr-17 | $446.26 | Trejo | Ramon |
| 07-Apr-17 | $1,505.70 | Trejo | Martin |
| 07-Apr-17 | $1,217.84 | Tran | Duc Van |
| 07-Apr-17 | $1,577.07 | Torres Diaz | Angel |
| 07-Apr-17 | $1,124.67 | Torres | Mercedes |
| 07-Apr-17 | $986.46 | Torres | Maria Delaluz |
| 07-Apr-17 | $1,064.93 | Torres | Gabriela |
| 07-Apr-17 | $1,101.44 | Torres | Alfonso |
| 07-Apr-17 | $1,450.19 | Torrealba Osorio | Levit |
| 07-Apr-17 | $626.64 | Tojin | Marco |
| 07-Apr-17 | $981.80 | Tjio | Jemmy |
| 07-Apr-17 | $500.17 | Tjio | Jemmy |
| 07-Apr-17 | $1,101.30 | Thomsen | Paul |
| 07-Apr-17 | $1,018.63 | Thao | Jason |
| 07-Apr-17 | $721.94 | Terronez | Daniel |
| 07-Apr-17 | $1,654.69 | Ternavskyy | Sergiy |
| 07-Apr-17 | $1,003.81 | Terinate | Denny |
| 07-Apr-17 | $562.53 | Tellez-Medina | Kevin |
| 07-Apr-17 | $82.28 | Tellez-Medina | Kevin |
| 07-Apr-17 | $3,170.96 | Tellez | Alberto Jose |

**Unity Courier Service**
**Expected  Payroll to be Paid 4/7/17**
**for the payroll period ended 3/31/17**

| Payment Date | Payment Amount | Last Name | First Name |
|---|---|---|---|
| 07-Apr-17 | $1,315.24 | Tejada | Jose |
| 07-Apr-17 | $898.48 | Taylor Jr | Edward Dan |
| 07-Apr-17 | $1,387.48 | Tang | Yuk Lun |
| 07-Apr-17 | $1,693.50 | Tang | Eric |
| 07-Apr-17 | $695.80 | Tan | Run Peng |
| 07-Apr-17 | $81.68 | Tan | Run Peng |
| 07-Apr-17 | $116.42 | Tamayo Vargas | Yadira |
| 07-Apr-17 | $1,377.30 | Suy Lopez | Cesar |
| 07-Apr-17 | $958.51 | Surjono | Nikmat |
| 07-Apr-17 | $993.58 | Surjono | Makmur |
| 07-Apr-17 | $1,065.69 | Suharto | Suharto |
| 07-Apr-17 | $2,895.94 | Suarez | Danton |
| 07-Apr-17 | $975.04 | Stroup | Sharon L. |
| 07-Apr-17 | $226.58 | Stinson | Mary |
| 07-Apr-17 | $790.57 | Stanfill | David |
| 07-Apr-17 | $1,186.35 | Sta Ines | Ma Theresa |
| 07-Apr-17 | $924.51 | Srivapa | Likit |
| 07-Apr-17 | $1,022.27 | Srimek | Somkiet |
| 07-Apr-17 | $2,363.37 | Sorto | Mario Ernesto |
| 07-Apr-17 | $1,650.21 | Sookpisal | Somchai |
| 07-Apr-17 | $888.26 | Songprasert | Tasanee |
| 07-Apr-17 | $1,377.62 | Solorzano | Guillermo |
| 07-Apr-17 | ($1,377.62) | Solorzano | Guillermo |
| 07-Apr-17 | $1,611.22 | Solorzano | Guillermo |
| 07-Apr-17 | $1,541.07 | Solano | Javier |
| 07-Apr-17 | $617.83 | Smith | Marvin |
| 07-Apr-17 | $1,229.48 | Smith | Latwana |
| 07-Apr-17 | $1,013.04 | Smith | John Wilson III |
| 07-Apr-17 | $1,598.64 | Smith | John Wilson III |
| 07-Apr-17 | $657.88 | Smith | DeAndre |
| 07-Apr-17 | $1,260.36 | Smith | Anthony |
| 07-Apr-17 | $1,305.33 | Skalskiy | Vladimir |
| 07-Apr-17 | $536.17 | Skalska | Anna |
| 07-Apr-17 | $2,445.96 | Singh | Saran |
| 07-Apr-17 | $1,813.52 | Singh | Sandeep |
| 07-Apr-17 | $1,487.23 | Singh | Rajinder |
| 07-Apr-17 | $1,280.18 | Singh | Rajinder |
| 07-Apr-17 | ($1,487.23) | Singh | Rajinder |
| 07-Apr-17 | $1,206.32 | Singh | Parvinder |
| 07-Apr-17 | $1,871.38 | Singh | Parmjit |

**Unity Courier Service**
**Expected  Payroll to be Paid 4/7/17**
**for the payroll period ended 3/31/17**

| Payment Date | Payment Amount | Last Name | First Name |
|---|---|---|---|
| 07-Apr-17 | ($1,871.38) | Singh | Parmjit |
| 07-Apr-17 | $1,635.14 | Singh | Parmjit |
| 07-Apr-17 | $2,174.16 | Singh | Parminder |
| 07-Apr-17 | $1,577.04 | Singh | Maung Opkar |
| 07-Apr-17 | $1,408.78 | Singh | Maung Opkar |
| 07-Apr-17 | ($1,577.04) | Singh | Maung Opkar |
| 07-Apr-17 | $564.59 | Singh | Manjit |
| 07-Apr-17 | $2,137.80 | Singh | Kashmir |
| 07-Apr-17 | ($2,137.80) | Singh | Kashmir |
| 07-Apr-17 | $1,154.15 | Singh | Kashmir |
| 07-Apr-17 | $1,385.21 | Singh | Joga |
| 07-Apr-17 | $860.47 | Singh | Jaspal |
| 07-Apr-17 | $1,576.57 | Singh | Gurpreet |
| 07-Apr-17 | $2,403.63 | Singh | Baljinder |
| 07-Apr-17 | $1,447.41 | Singh | Baldeep |
| 07-Apr-17 | $784.72 | Simbolon | Joppy |
| 07-Apr-17 | $1,390.21 | Silva | Antonio |
| 07-Apr-17 | $1,317.13 | Silprasit | Tanasit |
| 07-Apr-17 | $1,229.61 | Siharath | Jack |
| 07-Apr-17 | $2,768.18 | Sidhu | Gurmit Singh |
| 07-Apr-17 | ($2,768.18) | Sidhu | Gurmit Singh |
| 07-Apr-17 | $2,475.83 | Sidhu | Gurmit Singh |
| 07-Apr-17 | $897.24 | Siburian | Partogi |
| 07-Apr-17 | $1,197.52 | Shupp | David |
| 07-Apr-17 | $955.28 | Shponarskiy | Leonid |
| 07-Apr-17 | $2,136.58 | Shipp | Gary |
| 07-Apr-17 | $137.25 | Sharma | Pranesh |
| 07-Apr-17 | ($2,689.15) | Sharma | Pranesh |
| 07-Apr-17 | $1,827.88 | Sharma | Pranesh |
| 07-Apr-17 | $2,689.15 | Sharma | Pranesh |
| 07-Apr-17 | $2,085.88 | Sharifi | Alireza |
| 07-Apr-17 | $694.69 | Shah | Murtaza Wali |
| 07-Apr-17 | $1,991.26 | Serrano | Milton |
| 07-Apr-17 | ($1,991.26) | Serrano | Milton |
| 07-Apr-17 | $1,001.92 | Serrano | Milton |
| 07-Apr-17 | ($1,313.83) | Serrano | Michael |
| 07-Apr-17 | $905.79 | Serrano | Michael |
| 07-Apr-17 | $1,313.83 | Serrano | Michael |
| 07-Apr-17 | $42.07 | Serrano | Daniel |
| 07-Apr-17 | $83.03 | Serrano | Daniel |

**Unity Courier Service**
**Expected  Payroll to be Paid 4/7/17**
**for the payroll period ended 3/31/17**

| Payment Date | Payment Amount | Last Name | First Name |
|---|---|---|---|
| 07-Apr-17 | $1,173.23 | Serpas | Elmer |
| 07-Apr-17 | $1,568.46 | Sepeli | Denis |
| 07-Apr-17 | $1,733.39 | Sepeli | Alexandr Pavel |
| 07-Apr-17 | $1,599.56 | Sepeli | Alexandr Pavel |
| 07-Apr-17 | ($1,733.39) | Sepeli | Alexandr Pavel |
| 07-Apr-17 | $642.26 | Semjid | Oyuntulkhuur |
| 07-Apr-17 | $1,767.92 | Sehgal | Rekha |
| 07-Apr-17 | ($1,767.92) | Sehgal | Rekha |
| 07-Apr-17 | $1,741.90 | Sehgal | Rekha |
| 07-Apr-17 | $1,361.94 | Segura | Brenda |
| 07-Apr-17 | $514.65 | Sarie | Mariesca |
| 07-Apr-17 | $1,523.85 | Santos-Yocute | Margarito |
| 07-Apr-17 | $1,630.22 | Santos | Julio |
| 07-Apr-17 | $2,947.84 | Santos | Jerome Arceo |
| 07-Apr-17 | $1,125.17 | Santos | Jenny |
| 07-Apr-17 | $985.52 | Santos | Ena |
| 07-Apr-17 | $1,196.83 | Santana-Rodriguez | Lucia |
| 07-Apr-17 | $1,314.45 | Santamaria | Jose |
| 07-Apr-17 | $1,690.43 | Sangha | Gurmant Singh |
| 07-Apr-17 | ($1,690.43) | Sangha | Gurmant Singh |
| 07-Apr-17 | $1,450.70 | Sangha | Gurmant Singh |
| 07-Apr-17 | $1,318.18 | Saneekosol | Surasak |
| 07-Apr-17 | $1,165.91 | Sandres | Ulises |
| 07-Apr-17 | $732.03 | Sandres | Bertha |
| 07-Apr-17 | $697.97 | Sandres | Bertha |
| 07-Apr-17 | ($732.03) | Sandres | Bertha |
| 07-Apr-17 | $1,529.25 | Sandoval Quinones | Gabriel |
| 07-Apr-17 | $761.05 | Sandoval | Jose |
| 07-Apr-17 | $282.53 | Sandino | Lesther Jose |
| 07-Apr-17 | ($1,176.43) | Sanderson | John |
| 07-Apr-17 | $1,027.74 | Sanderson | John |
| 07-Apr-17 | $1,176.43 | Sanderson | John |
| 07-Apr-17 | $100.44 | Sanciangco Jr | Julian |
| 07-Apr-17 | $492.34 | Sanciangco Jr | Julian |
| 07-Apr-17 | $882.62 | Sanciangco | Julius Angelo |
| 07-Apr-17 | $37.53 | Sanciangco | Julius Angelo |
| 07-Apr-17 | $1,252.44 | Sanchez Aguilar | Mario |
| 07-Apr-17 | $1,447.07 | Sanchez | Pablo |
| 07-Apr-17 | $1,071.36 | Sanchez | Martha |
| 07-Apr-17 | $1,807.99 | Sanchez | Jose |

**Unity Courier Service**
**Expected  Payroll to be Paid 4/7/17**
**for the payroll period ended 3/31/17**

| Payment Date | Payment Amount | Last Name | First Name |
|---|---|---|---|
| 07-Apr-17 | ($894.27) | Sanchez | Daniel |
| 07-Apr-17 | $900.58 | Sanchez | Daniel |
| 07-Apr-17 | $894.27 | Sanchez | Daniel |
| 07-Apr-17 | $2,219.38 | Sanchez | Alfredo |
| 07-Apr-17 | $1,371.88 | Salinas | Carlos |
| 07-Apr-17 | $1,078.69 | Salguero | Julio |
| 07-Apr-17 | $1,662.14 | Salgado Alvarez | Carlos Alberto |
| 07-Apr-17 | $1,411.59 | Salgado | Jose |
| 07-Apr-17 | ($2,389.72) | Salem | Fransiscus |
| 07-Apr-17 | $1,633.91 | Salem | Fransiscus |
| 07-Apr-17 | $2,389.72 | Salem | Fransiscus |
| 07-Apr-17 | $1,981.71 | Saldareaga | Luis |
| 07-Apr-17 | $259.61 | Saldareaga | Luis |
| 07-Apr-17 | $2,316.11 | Salazar | Silvia |
| 07-Apr-17 | $1,176.73 | Salazar | Mario |
| 07-Apr-17 | $1,638.15 | Salas Flores | Sandra Cecilia |
| 07-Apr-17 | $1,481.60 | Sagala | Ismanto |
| 07-Apr-17 | $135.02 | Sagala | Ismanto |
| 07-Apr-17 | $1,010.84 | Saevang | Mouang |
| 07-Apr-17 | $1,017.48 | Saenz | David |
| 07-Apr-17 | $1,664.31 | Sabile | Aurelio |
| 07-Apr-17 | $1,162.59 | Sabile | Aurelio |
| 07-Apr-17 | ($1,664.31) | Sabile | Aurelio |
| 07-Apr-17 | $1,320.52 | Sabas | Alfred Q. |
| 07-Apr-17 | $123.05 | Ruiz | Ofelia |
| 07-Apr-17 | $1,132.45 | Ruiz | Ofelia |
| 07-Apr-17 | $792.19 | Ruiz | Arnoldo |
| 07-Apr-17 | $2,376.31 | Ruelas | Lilia |
| 07-Apr-17 | $1,349.73 | Rosales | Noe |
| 07-Apr-17 | $699.76 | Rosales | Josue |
| 07-Apr-17 | $90.30 | Rosales | Josue |
| 07-Apr-17 | $405.20 | Rosales | Jose |
| 07-Apr-17 | $1,010.56 | Roque | Jose |
| 07-Apr-17 | $1,776.43 | Romo | Marin |
| 07-Apr-17 | $758.35 | Rombough | Steven Todd |
| 07-Apr-17 | $1,829.94 | Rolle | Florante R. |
| 07-Apr-17 | $1,800.27 | Rogers | John |
| 07-Apr-17 | $1,667.11 | Rodriquez | Mark |
| 07-Apr-17 | $1,582.30 | Rodriguez Ruiz | Carlos |
| 07-Apr-17 | $898.42 | Rodriguez | Roberto |

**Unity Courier Service**
**Expected  Payroll to be Paid 4/7/17**
**for the payroll period ended 3/31/17**

| Payment Date | Payment Amount | Last Name | First Name |
|---|---|---|---|
| 07-Apr-17 | $1,255.87 | Rodriguez | Pedro |
| 07-Apr-17 | $1,461.03 | Rodriguez | Mario |
| 07-Apr-17 | $1,005.62 | Rodriguez | Mario |
| 07-Apr-17 | $108.23 | Rodriguez | Mario |
| 07-Apr-17 | $532.22 | Rodriguez | Julio |
| 07-Apr-17 | $834.09 | Rodriguez | Jose Jesus |
| 07-Apr-17 | $1,242.92 | Rodriguez | Blanca |
| 07-Apr-17 | $1,446.33 | Rodriguez | Ana Cecilia |
| 07-Apr-17 | $894.33 | Rocha | Steve |
| 07-Apr-17 | $539.29 | Rocha | Kenneth S |
| 07-Apr-17 | $162.22 | Rocha | Kenneth |
| 07-Apr-17 | $1,413.52 | Robles | Luis |
| 07-Apr-17 | $1,923.18 | Robles | Jose |
| 07-Apr-17 | $1,873.86 | Robles | Jose |
| 07-Apr-17 | ($1,923.18) | Robles | Jose |
| 07-Apr-17 | $1,607.31 | Robinson | Vernon |
| 07-Apr-17 | $1,009.53 | Robert | Jimmy Anthony |
| 07-Apr-17 | $158.63 | Roa | Cynthia |
| 07-Apr-17 | $3,769.51 | Rivera De Hernandez | Martha |
| 07-Apr-17 | $1,333.81 | Rivera De Hernandez | Martha |
| 07-Apr-17 | ($3,769.51) | Rivera De Hernandez | Martha |
| 07-Apr-17 | ($2,694.74) | Rivera | Karina |
| 07-Apr-17 | $2,519.20 | Rivera | Karina |
| 07-Apr-17 | $2,694.74 | Rivera | Karina |
| 07-Apr-17 | $896.38 | Rivera | Ana |
| 07-Apr-17 | $973.51 | Rivenbark | Daniel |
| 07-Apr-17 | $1,237.22 | Rivas | Efrain |
| 07-Apr-17 | $1,442.32 | Rios | Alexander |
| 07-Apr-17 | $690.72 | Ricardos | Allyssa |
| 07-Apr-17 | $1,574.91 | Ricardez | Jaime |
| 07-Apr-17 | $1,367.36 | Riad Rezk | Amir |
| 07-Apr-17 | $1,179.39 | Reyes | Samuel |
| 07-Apr-17 | $1,268.07 | Reyes | Rodolfo |
| 07-Apr-17 | $856.02 | Reyes | Alexander |
| 07-Apr-17 | $1,322.83 | Reyes | Alex |
| 07-Apr-17 | $909.73 | Reveles, Jr | Gabriel |
| 07-Apr-17 | $1,403.28 | Renoj | Eduardo |
| 07-Apr-17 | $2,079.60 | Reinhart Jr | Gerard John |
| 07-Apr-17 | ($2,079.60) | Reinhart Jr | Gerard John |
| 07-Apr-17 | $2,074.25 | Reinhart Jr | Gerard John |

**Unity Courier Service**
**Expected  Payroll to be Paid 4/7/17**
**for the payroll period ended 3/31/17**

| Payment Date | Payment Amount | Last Name | First Name |
|---|---|---|---|
| 07-Apr-17 | $2,794.44 | Recinos Diaz | Jose |
| 07-Apr-17 | $1,483.47 | Raza | Ahmad |
| 07-Apr-17 | $494.02 | Raymundo | Brayant |
| 07-Apr-17 | $628.27 | Raymundo | Brayant |
| 07-Apr-17 | $1,046.44 | Ratinoff | Fernando |
| 07-Apr-17 | $1,408.39 | Rastorguev | Andrey |
| 07-Apr-17 | $1,472.16 | Rarungkuan | Marten |
| 07-Apr-17 | $1,037.51 | Rangsiyananta | Sanguan |
| 07-Apr-17 | $1,349.60 | Randhawa | Baljinder |
| 07-Apr-17 | $563.57 | Ramos | John Matthew |
| 07-Apr-17 | $804.76 | Ramos | Edward |
| 07-Apr-17 | $1,239.60 | Ramirez Rizo | Jose |
| 07-Apr-17 | $958.78 | Ramirez | Molly |
| 07-Apr-17 | $1,515.79 | Ramirez | Juan |
| 07-Apr-17 | $1,272.83 | Ramirez | Gerardo |
| 07-Apr-17 | $1,089.20 | Ramirez | Artemio |
| 07-Apr-17 | $1,324.16 | Ragsdale | Terry |
| 07-Apr-17 | $1,389.27 | Quiroz | Tomas |
| 07-Apr-17 | $858.41 | Quiquivix | Jorge |
| 07-Apr-17 | $1,232.91 | Quintero | Jose |
| 07-Apr-17 | $1,457.67 | Quintero | Benjamin C. |
| 07-Apr-17 | $1,185.07 | Quintanilla | David |
| 07-Apr-17 | $1,313.34 | Quinonez | Ramon |
| 07-Apr-17 | $1,128.77 | Quezada | Mario |
| 07-Apr-17 | $1,923.06 | Quevedo | Fernando |
| 07-Apr-17 | $1,122.85 | Querubin | Lorenzo |
| 07-Apr-17 | $1,563.79 | Purev | Boldbaatar |
| 07-Apr-17 | $1,442.21 | Purev | Boldbaatar |
| 07-Apr-17 | ($1,563.79) | Purev | Boldbaatar |
| 07-Apr-17 | $1,412.09 | Pua | Nestor |
| 07-Apr-17 | $1,283.62 | Provence | Ed |
| 07-Apr-17 | $1,079.01 | Priest | Trevor |
| 07-Apr-17 | $717.75 | Priest | Andrew |
| 07-Apr-17 | $881.67 | Preekran | Anongnat |
| 07-Apr-17 | $1,342.32 | Prasad | Amit |
| 07-Apr-17 | $1,855.70 | Praphasuk | Jitraroch |
| 07-Apr-17 | $2,258.23 | Pozas Becerril | Marco |
| 07-Apr-17 | ($2,258.23) | Pozas Becerril | Marco |
| 07-Apr-17 | $1,753.14 | Pozas Becerril | Marco |
| 07-Apr-17 | $1,166.41 | Pouwongpat | Sorana |

Copy of Unity FDay Wage Exhibit 1 04 04 17 fnl.1.xlsx In re Unity Courier Service, Inc.
Case No. 2:17-bk-13943-ER                                                                          9  of 28
Page 22 of 90

**Unity Courier Service**
**Expected  Payroll to be Paid 4/7/17**
**for the payroll period ended 3/31/17**

| Payment Date | Payment Amount | Last Name | First Name |
|---|---|---|---|
| 07-Apr-17 | $1,238.25 | Pourdavood | Rouben |
| 07-Apr-17 | $1,169.31 | Pogue III | Roy Arnold |
| 07-Apr-17 | $421.17 | Poerwanto | Indra |
| 07-Apr-17 | $1,763.60 | Plascencia-Adame | Jose |
| 07-Apr-17 | $1,484.54 | Pineda | Marco |
| 07-Apr-17 | $1,937.11 | Pineda | Luis |
| 07-Apr-17 | $1,078.41 | Pibuldhanapatana | Yongyudh |
| 07-Apr-17 | $1,221.62 | Pibuldhanapatana | Sanphchai |
| 07-Apr-17 | ($1,221.62) | Pibuldhanapatana | Sanphchai |
| 07-Apr-17 | $961.99 | Pibuldhanapatana | Sanphchai |
| 07-Apr-17 | $1,150.08 | Phumchun | Voraphot |
| 07-Apr-17 | $754.41 | Phompong | Boonh |
| 07-Apr-17 | $2,289.37 | Phim | Thing |
| 07-Apr-17 | ($2,289.37) | Phim | Thing |
| 07-Apr-17 | $1,046.50 | Phim | Thing |
| 07-Apr-17 | $1,237.47 | Petprasert | Serm |
| 07-Apr-17 | ($1,928.07) | Perez-Calles | Jose |
| 07-Apr-17 | $1,766.18 | Perez-Calles | Jose |
| 07-Apr-17 | $1,928.07 | Perez-Calles | Jose |
| 07-Apr-17 | $753.42 | Perez de Sullivan | Maria |
| 07-Apr-17 | $1,371.82 | Perez | Ruben G. |
| 07-Apr-17 | $1,228.42 | Perez | Joaquin |
| 07-Apr-17 | $1,011.30 | Perez | Francisco |
| 07-Apr-17 | $1,524.60 | Perez | Eva |
| 07-Apr-17 | $1,521.06 | Perez | Eliseo |
| 07-Apr-17 | $1,388.14 | Perez | Eliseo |
| 07-Apr-17 | ($1,521.06) | Perez | Eliseo |
| 07-Apr-17 | $2,272.08 | Perez | Delia |
| 07-Apr-17 | $1,004.75 | Perez | Christian |
| 07-Apr-17 | $2,353.79 | Perez | Arturo |
| 07-Apr-17 | $1,019.51 | Perez | Alberto |
| 07-Apr-17 | $2,674.91 | Peralta | Jaime |
| 07-Apr-17 | $1,333.39 | Peniche | John |
| 07-Apr-17 | $1,306.15 | Penagos | Alfredo |
| 07-Apr-17 | $1,176.92 | Pelle | Alfred T. |
| 07-Apr-17 | $889.74 | Payne | Ryan Saint Yves |
| 07-Apr-17 | $1,673.39 | Patel | Minakshi P. |
| 07-Apr-17 | $1,081.77 | Patel | Kartik |
| 07-Apr-17 | $1,383.34 | Pastor | Liliana |
| 07-Apr-17 | ($1,383.34) | Pastor | Liliana |

**Unity Courier Service**
**Expected Payroll to be Paid 4/7/17**
**for the payroll period ended 3/31/17**

| Payment Date | Payment Amount | Last Name | First Name |
|---|---|---|---|
| 07-Apr-17 | $1,314.95 | Pastor | Liliana |
| 07-Apr-17 | $1,454.81 | Passoni | Alfredo |
| 07-Apr-17 | ($1,651.36) | Passoni | Alfredo |
| 07-Apr-17 | $1,651.36 | Passoni | Alfredo |
| 07-Apr-17 | $1,505.02 | Parada | Orlando |
| 07-Apr-17 | $1,031.20 | Pantoja | Irma |
| 07-Apr-17 | $822.66 | Panis | Cecil |
| 07-Apr-17 | $658.39 | Panian | Jan M. |
| 07-Apr-17 | $1,243.23 | Padua | Bernardo C. |
| 07-Apr-17 | $1,603.59 | Padam | Davinder K. |
| 07-Apr-17 | $471.12 | Ostos-Quintana | Diana |
| 07-Apr-17 | $877.64 | Osorio | Yaremy |
| 07-Apr-17 | $602.76 | Osorio | Ramon |
| 07-Apr-17 | $362.03 | Osorio | April |
| 07-Apr-17 | $886.14 | Osburn | Brenda Regina |
| 07-Apr-17 | $866.59 | Ortiz | Samantha |
| 07-Apr-17 | $1,202.52 | Orozco | Efren |
| 07-Apr-17 | $133.48 | Orozco | Efren |
| 07-Apr-17 | $200.25 | Orellana | Victor |
| 07-Apr-17 | $1,809.20 | Orellana | Victor |
| 07-Apr-17 | $783.47 | Orellana | Marlon |
| 07-Apr-17 | $1,978.44 | Orellana | Abercio |
| 07-Apr-17 | $274.39 | Olvera | Roberto |
| 07-Apr-17 | $554.71 | Olmedo | Stephanie |
| 07-Apr-17 | $1,039.02 | Oliveira | Wagna |
| 07-Apr-17 | $1,405.82 | Oh | Pan-Suk |
| 07-Apr-17 | $1,051.09 | Ogunnaike | Funmi |
| 07-Apr-17 | $451.63 | Ogunnaike | Funmi |
| 07-Apr-17 | $1,317.93 | Odari | Rajan |
| 07-Apr-17 | $599.65 | Octave | James D. |
| 07-Apr-17 | $1,480.11 | Ochoa Jr | Ernesto |
| 07-Apr-17 | $1,403.82 | Ochoa | Linda R. |
| 07-Apr-17 | $1,049.08 | Ochoa | Linda B. |
| 07-Apr-17 | $1,255.75 | Ochoa | Ernesto |
| 07-Apr-17 | $1,272.97 | Ochoa | Amber |
| 07-Apr-17 | $932.40 | Ochoa | Amber |
| 07-Apr-17 | $1,065.62 | O'neal | Derrick |
| 07-Apr-17 | $958.16 | Noguera | Ana |
| 07-Apr-17 | $1,297.87 | Nita | Fernando |
| 07-Apr-17 | $1,306.63 | Nino-Hernandez | Nabor |

**Unity Courier Service**
**Expected  Payroll to be Paid 4/7/17**
**for the payroll period ended 3/31/17**

| Payment Date | Payment Amount | Last Name | First Name |
|---|---|---|---|
| 07-Apr-17 | $1,232.31 | Nimsanga | Phairoj |
| 07-Apr-17 | $672.04 | Nguyen | Hai |
| 07-Apr-17 | $1,838.90 | Nguyen | Giau |
| 07-Apr-17 | $872.74 | Ngeth | Phai |
| 07-Apr-17 | $1,284.90 | Narvaez | Tita |
| 07-Apr-17 | $468.62 | Narayan | Nitesh |
| 07-Apr-17 | $210.29 | Naranjo Chavez | Jose Luis |
| 07-Apr-17 | $680.89 | Namba | Raymond T. |
| 07-Apr-17 | $1,222.39 | Najera-Farfan | Edvin |
| 07-Apr-17 | $1,810.39 | Najera | Gregorio H. |
| 07-Apr-17 | $1,121.75 | Naibkhyl | Khaled M. |
| 07-Apr-17 | $1,414.34 | Mussa | Ibrahim |
| 07-Apr-17 | $596.65 | Musigdilok | Vorapan |
| 07-Apr-17 | $1,432.24 | Muneenart | Suporn |
| 07-Apr-17 | $1,130.09 | Munda | Mardeo |
| 07-Apr-17 | $1,055.72 | Munaf | Mohammed |
| 07-Apr-17 | $1,444.76 | Moua | Tou |
| 07-Apr-17 | $256.67 | Moua | Thang |
| 07-Apr-17 | $1,131.30 | Morgan | Robert Keith |
| 07-Apr-17 | $1,057.16 | Moreno A. | Pablo Arturo |
| 07-Apr-17 | ($1,057.16) | Moreno A. | Pablo Arturo |
| 07-Apr-17 | $923.79 | Moreno A. | Pablo Arturo |
| 07-Apr-17 | $1,566.15 | Moreno | Jose |
| 07-Apr-17 | $1,337.92 | Moreno | Francisco J. |
| 07-Apr-17 | $990.68 | Moreno | Adriana |
| 07-Apr-17 | $1,385.26 | Morales-Quintero | Evelia |
| 07-Apr-17 | $1,176.15 | Morales-Ceron | Ascencion |
| 07-Apr-17 | $989.88 | Morales | Sandra Irene |
| 07-Apr-17 | $1,105.14 | Monterrosa | Juan |
| 07-Apr-17 | $873.11 | Montantes | Patrisha |
| 07-Apr-17 | $932.26 | Montaner | Richard |
| 07-Apr-17 | $2,394.07 | Monroy | Luz Maria |
| 07-Apr-17 | $1,012.23 | Monjaras | Reina |
| 07-Apr-17 | $1,239.38 | Monia | Samuel |
| 07-Apr-17 | $1,152.00 | Molina | Mauricio |
| 07-Apr-17 | $2,129.37 | Mireles | Rosa |
| 07-Apr-17 | $487.19 | Milligan Jr | Lee R. |
| 07-Apr-17 | $1,764.94 | Miller | Carolyn |
| 07-Apr-17 | $119.74 | Mikula | Jiri |
| 07-Apr-17 | $892.51 | Mikula | Jiri |

**Unity Courier Service**
**Expected  Payroll to be Paid 4/7/17**
**for the payroll period ended 3/31/17**

| Payment Date | Payment Amount | Last Name | First Name |
|---|---|---|---|
| 07-Apr-17 | $1,438.43 | Menendez | Noe |
| 07-Apr-17 | $1,275.55 | Menendez | Noe |
| 07-Apr-17 | ($1,438.43) | Menendez | Noe |
| 07-Apr-17 | $686.60 | Mendoza | Nolvia |
| 07-Apr-17 | $1,562.93 | Mendoza | Jose Antonio |
| 07-Apr-17 | $1,477.27 | Mendoza | Jose |
| 07-Apr-17 | $570.73 | Mendoza | Jason |
| 07-Apr-17 | $953.91 | Melnychuk | Vasyl |
| 07-Apr-17 | $846.01 | Melgar | Sandra |
| 07-Apr-17 | $1,144.93 | Mejia-Castro | Ronal |
| 07-Apr-17 | $1,196.26 | Mejia | Jose |
| 07-Apr-17 | ($1,790.07) | Medina Bono | Jose |
| 07-Apr-17 | $2,080.59 | Medina Bono | Jose |
| 07-Apr-17 | $1,790.07 | Medina Bono | Jose |
| 07-Apr-17 | $2,580.88 | Mckelligott | Ryan |
| 07-Apr-17 | $1,230.60 | Mc Clain | Tina |
| 07-Apr-17 | $1,115.22 | Mayorga | Jose |
| 07-Apr-17 | $1,345.48 | Mayen | Sandra |
| 07-Apr-17 | $1,752.86 | Mathews | Robert |
| 07-Apr-17 | $810.25 | Mata | Maria |
| 07-Apr-17 | $929.78 | Mata | Cristal P. |
| 07-Apr-17 | $1,207.00 | Masferrer | Carlos |
| 07-Apr-17 | $1,300.70 | Martinez-Giron | Juan |
| 07-Apr-17 | $892.79 | Martinez Baires | Carlos Humberto |
| 07-Apr-17 | $1,681.11 | Martinez B. | Judith |
| 07-Apr-17 | $1,898.56 | Martinez | Veronica |
| 07-Apr-17 | $1,435.57 | Martinez | Moises |
| 07-Apr-17 | $1,235.38 | Martinez | Lidia |
| 07-Apr-17 | $672.15 | Martinez | Jose Luis |
| 07-Apr-17 | $1,767.39 | Martinez | Jose Eliy |
| 07-Apr-17 | $2,135.46 | Martinez | Jose Angel |
| 07-Apr-17 | $402.38 | Martinez | Jose |
| 07-Apr-17 | $1,559.82 | Martinez | Isidro |
| 07-Apr-17 | $2,437.37 | Martinez | Corina |
| 07-Apr-17 | $402.19 | Martinez | Christina |
| 07-Apr-17 | $1,235.28 | Martinez | Caroline |
| 07-Apr-17 | $603.92 | Marrou | Maria |
| 07-Apr-17 | $607.14 | Marroquin | Sonia Elizabeth |
| 07-Apr-17 | $190.84 | Marquez-Segovia | Juan |
| 07-Apr-17 | $1,661.03 | Marquez-Segovia | Juan |

**Unity Courier Service**
**Expected  Payroll to be Paid 4/7/17**
**for the payroll period ended 3/31/17**

| Payment Date | Payment Amount | Last Name | First Name |
|---|---|---|---|
| 07-Apr-17 | $1,393.22 | Marouf | Masoud |
| 07-Apr-17 | $1,398.28 | Markoglo | Semion |
| 07-Apr-17 | $1,179.39 | Manzano Lopez | Iris |
| 07-Apr-17 | $1,139.04 | Manzano Lopez | Iris |
| 07-Apr-17 | $1,123.70 | Manullang | Kusmin |
| 07-Apr-17 | $1,438.34 | Manrique Cortez | Luis Alfredo |
| 07-Apr-17 | $780.13 | Mamesah | Sharief |
| 07-Apr-17 | $1,030.84 | Malpica | David |
| 07-Apr-17 | $1,701.89 | Maldonado | Jahaira |
| 07-Apr-17 | $1,325.65 | Maldonado | Alexis |
| 07-Apr-17 | $2,597.07 | Magnuson | Cynthia |
| 07-Apr-17 | $1,290.91 | Madrigal Pantoja | Ma Del Rocio |
| 07-Apr-17 | $1,024.60 | Madrigal | Ramon |
| 07-Apr-17 | $1,279.15 | Madrigal | Ernesto |
| 07-Apr-17 | $1,356.37 | Ly | Kevn |
| 07-Apr-17 | $925.83 | Luu | Lam |
| 07-Apr-17 | $1,194.78 | Luttrell | Wanda |
| 07-Apr-17 | $1,532.48 | Lupsa | Vasile |
| 07-Apr-17 | $1,240.82 | Lumingkewas | Raymond |
| 07-Apr-17 | $2,507.46 | Lum | Larry |
| 07-Apr-17 | $134.80 | Lukban | BeeJay |
| 07-Apr-17 | $1,333.28 | Lukban | BeeJay |
| 07-Apr-17 | $1,382.90 | Luitel | Shiva |
| 07-Apr-17 | $17.75 | Luitel | Shiva |
| 07-Apr-17 | $712.85 | Loza | Martin |
| 07-Apr-17 | $1,542.16 | Loyola | David |
| 07-Apr-17 | $701.06 | Lor | See Yee |
| 07-Apr-17 | $585.21 | Lor | See Yee |
| 07-Apr-17 | ($701.06) | Lor | See Yee |
| 07-Apr-17 | $1,379.22 | Lor | Nelson |
| 07-Apr-17 | $329.24 | Lopez De Noguera | Xiomara |
| 07-Apr-17 | $632.81 | Lopez | Ruben L |
| 07-Apr-17 | $540.09 | Lopez | Ruben |
| 07-Apr-17 | $1,204.19 | Lopez | Nelly |
| 07-Apr-17 | $1,453.69 | Lopez | Juan |
| 07-Apr-17 | $467.42 | Loo Fernandez | Jaime |
| 07-Apr-17 | ($2,807.85) | Lodin | Bashir |
| 07-Apr-17 | $2,346.46 | Lodin | Bashir |
| 07-Apr-17 | $2,807.85 | Lodin | Bashir |
| 07-Apr-17 | $1,019.84 | Llaury | Luis |

**Unity Courier Service**
**Expected  Payroll to be Paid 4/7/17**
**for the payroll period ended 3/31/17**

| Payment Date | Payment Amount | Last Name | First Name |
|---|---|---|---|
| 07-Apr-17 | $1,446.38 | Lira | Juan |
| 07-Apr-17 | $2,308.38 | Lipson | Louis |
| 07-Apr-17 | $983.07 | Lintong | Renald |
| 07-Apr-17 | $1,217.98 | Linares | Jaime |
| 07-Apr-17 | $1,113.95 | Lim III | Salvador |
| 07-Apr-17 | $2,127.60 | Lim | Tommy |
| 07-Apr-17 | $1,188.32 | Liem | Sian |
| 07-Apr-17 | $2,231.24 | Levko | Eduard |
| 07-Apr-17 | $1,365.79 | Lester | Jermaine |
| 07-Apr-17 | $236.00 | Leonardo | Reinerio |
| 07-Apr-17 | $1,207.21 | Leon | Delfino |
| 07-Apr-17 | $1,250.52 | Leevarinpanich | Virot |
| 07-Apr-17 | $1,055.84 | Lee | Rickey |
| 07-Apr-17 | $630.64 | Leary | Alex |
| 07-Apr-17 | ($630.64) | Leary | Alex |
| 07-Apr-17 | $681.16 | Leary | Alex |
| 07-Apr-17 | $1,127.29 | Leadley | John |
| 07-Apr-17 | $1,503.53 | Le | Chi |
| 07-Apr-17 | $1,128.90 | Lazarte | Franklin |
| 07-Apr-17 | $922.26 | Lazaro | Francisco |
| 07-Apr-17 | $844.45 | Lazaro | Francisco |
| 07-Apr-17 | ($1,858.25) | Lazarev | Constantin |
| 07-Apr-17 | $1,598.34 | Lazarev | Constantin |
| 07-Apr-17 | $1,858.25 | Lazarev | Constantin |
| 07-Apr-17 | $1,545.56 | Lara | Brenis |
| 07-Apr-17 | $1,549.45 | Lao | Jason |
| 07-Apr-17 | $1,284.01 | Lanum | James |
| 07-Apr-17 | $731.60 | Langley | Richard |
| 07-Apr-17 | $642.00 | Lamoureaux | Sheri |
| 07-Apr-17 | $573.79 | Lagunas | Christopher |
| 07-Apr-17 | $717.72 | Lafleur | Riley |
| 07-Apr-17 | $1,292.00 | Korneva | Tatyana A. |
| 07-Apr-17 | $1,193.04 | Kornev | Sergey |
| 07-Apr-17 | $1,209.66 | Kongmuang | Sittichai |
| 07-Apr-17 | $1,478.54 | Koke | John |
| 07-Apr-17 | ($734.70) | Klair | Som Nath |
| 07-Apr-17 | $611.51 | Klair | Som Nath |
| 07-Apr-17 | $734.70 | Klair | Som Nath |
| 07-Apr-17 | $1,379.17 | Kissinger | Richard |
| 07-Apr-17 | $1,383.32 | Kian | Yeprem |

**Unity Courier Service**
**Expected  Payroll to be Paid 4/7/17**
**for the payroll period ended 3/31/17**

| Payment Date | Payment Amount | Last Name | First Name |
|---|---|---|---|
| 07-Apr-17 | $1,125.29 | Khem | Sarah |
| 07-Apr-17 | ($1,125.29) | Khem | Sarah |
| 07-Apr-17 | $1,099.81 | Khem | Sarah |
| 07-Apr-17 | $1,550.22 | Khaoone | Andrew |
| 07-Apr-17 | $883.56 | Khan | Masum A. |
| 07-Apr-17 | ($883.56) | Khan | Masum A. |
| 07-Apr-17 | $880.93 | Khan | Masum A. |
| 07-Apr-17 | $2,007.72 | Khakh | Paramjit |
| 07-Apr-17 | $1,256.74 | Khakh | Balbir |
| 07-Apr-17 | $1,675.75 | Kennedy | Bradford Warren |
| 07-Apr-17 | $1,432.09 | Kcomt | Jorge |
| 07-Apr-17 | $1,364.80 | Kay | Denis |
| 07-Apr-17 | $1,462.21 | Kaur | Simerjit |
| 07-Apr-17 | ($1,462.21) | Kaur | Simerjit |
| 07-Apr-17 | $1,731.83 | Kaur | Simerjit |
| 07-Apr-17 | $1,537.74 | Kaur | Ramandeep |
| 07-Apr-17 | $1,385.26 | Kaur | Rajwinder |
| 07-Apr-17 | $2,126.02 | Joya-Iglesias | Delmy |
| 07-Apr-17 | $2,131.31 | Johnston | Jeanette P. |
| 07-Apr-17 | $940.77 | Johnson | Stoney |
| 07-Apr-17 | ($1,618.20) | Jimenez | Gerardo W. |
| 07-Apr-17 | $1,216.90 | Jimenez | Gerardo W. |
| 07-Apr-17 | $1,618.20 | Jimenez | Gerardo W. |
| 07-Apr-17 | $1,581.02 | Jarquin | Abundio |
| 07-Apr-17 | $1,271.43 | Janthorn | Praphat |
| 07-Apr-17 | $1,187.68 | Jacobo | Jose |
| 07-Apr-17 | $1,139.40 | Jacobo | Jose |
| 07-Apr-17 | ($1,187.68) | Jacobo | Jose |
| 07-Apr-17 | $1,240.38 | Ixchop | Demetrio |
| 07-Apr-17 | $1,649.58 | Ivory | Rachanee |
| 07-Apr-17 | $1,164.35 | Itzep | Faustino |
| 07-Apr-17 | $1,093.20 | Islas | Rosario |
| 07-Apr-17 | $453.35 | Islas | Jose M. |
| 07-Apr-17 | $907.56 | Islas | Enrique |
| 07-Apr-17 | $1,421.06 | Irizarry-Feliciano | Jose |
| 07-Apr-17 | $763.72 | Ibarguen-Jimenez | Jose |
| 07-Apr-17 | $2,858.56 | Hussain | Mohammed Khalik |
| 07-Apr-17 | $1,561.93 | Hussain | Mohammed Khalik |
| 07-Apr-17 | ($2,858.56) | Hussain | Mohammed Khalik |
| 07-Apr-17 | $762.74 | Huff | Stanley |

**Unity Courier Service**
**Expected  Payroll to be Paid 4/7/17**
**for the payroll period ended 3/31/17**

| Payment Date | Payment Amount | Last Name | First Name |
|---|---|---|---|
| 07-Apr-17 | $1,394.45 | Huezo | Olga |
| 07-Apr-17 | $339.04 | Huezo | Jean |
| 07-Apr-17 | $594.41 | Huerta | Nicolas |
| 07-Apr-17 | $1,177.51 | Hovenden | Charles Robert |
| 07-Apr-17 | $1,092.70 | Holguin | Maria |
| 07-Apr-17 | $207.59 | Hinojosa Ruiz | Omar |
| 07-Apr-17 | $1,090.03 | Hinnen | Dale |
| 07-Apr-17 | $874.68 | Himbing | Julian |
| 07-Apr-17 | $668.71 | Hildreth | Gladney |
| 07-Apr-17 | $1,375.81 | Hidalgo | Sharon |
| 07-Apr-17 | $1,065.75 | Hess | Benny |
| 07-Apr-17 | $844.41 | Herzog | Jason |
| 07-Apr-17 | $60.82 | Herzog | Jason |
| 07-Apr-17 | $1,059.53 | Herrera | Moises |
| 07-Apr-17 | $971.18 | Herrera | Augusto |
| 07-Apr-17 | $1,422.93 | Herrera | Ana |
| 07-Apr-17 | ($1,422.93) | Herrera | Ana |
| 07-Apr-17 | $1,246.57 | Herrera | Ana |
| 07-Apr-17 | $990.87 | Hernandez-Perez | Aurora |
| 07-Apr-17 | $1,958.39 | Hernandez-Orozco | Mario |
| 07-Apr-17 | $1,423.83 | Hernandez | Sabino |
| 07-Apr-17 | $965.97 | Hernandez | Luis |
| 07-Apr-17 | $2,872.22 | Hernandez | Juan |
| 07-Apr-17 | $673.76 | Hernandez | Gustavo |
| 07-Apr-17 | $591.69 | Hernandez | Gustavo |
| 07-Apr-17 | ($673.76) | Hernandez | Gustavo |
| 07-Apr-17 | $991.41 | Hernandez | Estanislao |
| 07-Apr-17 | $1,421.15 | Hernandez | Denis Jose |
| 07-Apr-17 | $356.04 | Hernandez | David |
| 07-Apr-17 | $1,954.21 | Hernandez | Abel |
| 07-Apr-17 | $1,254.81 | Hernandez | Abel |
| 07-Apr-17 | ($1,954.21) | Hernandez | Abel |
| 07-Apr-17 | $547.17 | Her | Fong |
| 07-Apr-17 | $1,232.62 | Her | Dang |
| 07-Apr-17 | $921.02 | Hawkins | Jerry |
| 07-Apr-17 | ($1,564.91) | Hawkins | Jerry |
| 07-Apr-17 | $1,564.91 | Hawkins | Jerry |
| 07-Apr-17 | $289.04 | Hawkins | Fatima |
| 07-Apr-17 | $913.23 | Hawkins | Fatima |
| 07-Apr-17 | $870.01 | Hasibuan | Dedy |

Copy of Unity FDay Wage Exhibit 1 04 04 17 fnl.1.xlsx In re Unity Courier Service, Inc.
Case No. 2:17-bk-13943-ER    17  of 28
Page 30 of 90

**Unity Courier Service**
**Expected  Payroll to be Paid 4/7/17**
**for the payroll period ended 3/31/17**

| Payment Date | Payment Amount | Last Name | First Name |
|---|---|---|---|
| 07-Apr-17 | $714.76 | Harrell | Shamika |
| 07-Apr-17 | $1,044.58 | Hantanachaikul | Wiwat |
| 07-Apr-17 | $1,114.16 | Hamilton | Kyle |
| 07-Apr-17 | $209.40 | Hall | Gary |
| 07-Apr-17 | $405.52 | Hall | Gary |
| 07-Apr-17 | $1,189.33 | Halim | Lukman |
| 07-Apr-17 | $1,042.84 | Halim | Lukman |
| 07-Apr-17 | ($1,189.33) | Halim | Lukman |
| 07-Apr-17 | $996.80 | Hackney | Michael |
| 07-Apr-17 | $693.08 | Hackney | Christopher |
| 07-Apr-17 | $2,493.04 | Guzman | Salvador |
| 07-Apr-17 | $2,244.18 | Guzman | Salvador |
| 07-Apr-17 | ($2,493.04) | Guzman | Salvador |
| 07-Apr-17 | $1,493.89 | Guzman | Manuel |
| 07-Apr-17 | $1,353.64 | Guzman | Jose |
| 07-Apr-17 | $1,889.83 | Guzar | Bogdan |
| 07-Apr-17 | $1,102.29 | Gutierrez | Mario |
| 07-Apr-17 | $1,415.18 | Gutierrez | Juan |
| 07-Apr-17 | $777.53 | Gulartie | John |
| 07-Apr-17 | $1,096.06 | Guevara | Brenda |
| 07-Apr-17 | $1,148.93 | Guevara | Alexander |
| 07-Apr-17 | $1,054.56 | Guerrero | Saul |
| 07-Apr-17 | $1,702.70 | Guerrero | Ivan |
| 07-Apr-17 | $1,318.24 | Guerrero | Ivan |
| 07-Apr-17 | $83.00 | Guerrero | Anabell |
| 07-Apr-17 | $1,077.47 | Guerrero | Anabell |
| 07-Apr-17 | $1,154.70 | Grokholsky | Vasily |
| 07-Apr-17 | $1,943.82 | Grimes | Evan |
| 07-Apr-17 | $812.91 | Grewal | Rajinder Singh |
| 07-Apr-17 | $1,004.81 | Greene | Rolanda |
| 07-Apr-17 | $1,140.97 | Gray Jr | Charles |
| 07-Apr-17 | $1,043.01 | Gratton | Sean |
| 07-Apr-17 | $1,294.69 | Granizo | Yanet |
| 07-Apr-17 | $1,179.73 | Govindan | Govindan |
| 07-Apr-17 | $2,813.10 | Gonzalez-Hernandez | Gilberto |
| 07-Apr-17 | ($2,813.10) | Gonzalez-Hernandez | Gilberto |
| 07-Apr-17 | $2,556.99 | Gonzalez-Hernandez | Gilberto |
| 07-Apr-17 | $1,475.47 | Gonzalez, Jr | Raymond |
| 07-Apr-17 | $2,080.24 | Gonzalez | Ruben |
| 07-Apr-17 | $1,134.80 | Gonzalez | Miguel |

**Unity Courier Service**
**Expected  Payroll to be Paid 4/7/17**
**for the payroll period ended 3/31/17**

| Payment Date | Payment Amount | Last Name | First Name |
|---|---|---|---|
| 07-Apr-17 | $1,453.87 | Gonzalez | Hugo |
| 07-Apr-17 | $995.48 | Gonzalez | Claudia |
| 07-Apr-17 | $1,179.38 | Gonzales | Raul |
| 07-Apr-17 | $2,314.92 | Goncalves | Magda Lucia |
| 07-Apr-17 | $1,931.62 | Wener | Wener |
| 07-Apr-17 | $1,076.16 | Gomez | Jose |
| 07-Apr-17 | $1,085.76 | Gomez | Irma |
| 07-Apr-17 | $1,093.26 | Gomez | Elmer |
| 07-Apr-17 | $881.57 | Gomez | Delmy |
| 07-Apr-17 | $1,072.09 | Gomez | Consuelo |
| 07-Apr-17 | $1,276.97 | Gomez | Charles |
| 07-Apr-17 | $554.09 | Godoy | Victor |
| 07-Apr-17 | $1,136.62 | Godoy | Maria |
| 07-Apr-17 | $911.98 | Godinez-Dominguez | Edelmira |
| 07-Apr-17 | $1,595.00 | Gill | Gurjit |
| 07-Apr-17 | ($1,595.00) | Gill | Gurjit |
| 07-Apr-17 | $1,393.90 | Gill | Gurjit |
| 07-Apr-17 | $1,500.32 | Gil-Villa | Carlos |
| 07-Apr-17 | $2,276.84 | Gil | Alex |
| 07-Apr-17 | $1,086.13 | Ghoman | Balwinder |
| 07-Apr-17 | $421.46 | Genova | Donna |
| 07-Apr-17 | $40.24 | Genova | Donna |
| 07-Apr-17 | $1,200.33 | Garnica | John |
| 07-Apr-17 | $1,300.42 | Garibay | Sergio |
| 07-Apr-17 | $764.26 | Gardea | Veronica |
| 07-Apr-17 | $2,317.08 | Garcia-Velasquez | Ismael |
| 07-Apr-17 | $54.90 | Garcia-Velasquez | Ismael |
| 07-Apr-17 | $1,143.73 | Garcia-Castillo | Tulio |
| 07-Apr-17 | $676.76 | Garcia Zuniga | Bertha |
| 07-Apr-17 | $688.83 | Garcia Ramos | Michel |
| 07-Apr-17 | $1,149.27 | Garcia Corona | Cesar |
| 07-Apr-17 | $932.73 | Garcia | Ross |
| 07-Apr-17 | $1,074.84 | Garcia | Miriam |
| 07-Apr-17 | $1,413.21 | Garcia | Juanita |
| 07-Apr-17 | $498.41 | Garcia | Jonathan |
| 07-Apr-17 | $1,331.20 | Garcia | Ginny |
| 07-Apr-17 | $1,772.19 | Garcia | Blas |
| 07-Apr-17 | $1,189.11 | Garcia | Anthony |
| 07-Apr-17 | $396.67 | Garcia | Anthony |
| 07-Apr-17 | $1,056.47 | Garcia | Ana |

**Unity Courier Service**
**Expected  Payroll to be Paid 4/7/17**
**for the payroll period ended 3/31/17**

| Payment Date | Payment Amount | Last Name | First Name |
|---|---|---|---|
| 07-Apr-17 | $1,457.86 | Garate | Jose |
| 07-Apr-17 | $1,199.95 | Gamalinda | Ivan |
| 07-Apr-17 | $2,048.01 | Gallagher Jr | Mark |
| 07-Apr-17 | $231.23 | Gallagher Jr | Mark |
| 07-Apr-17 | $1,256.25 | Galicia | Mynor |
| 07-Apr-17 | $1,586.93 | Gadea | Saturnino |
| 07-Apr-17 | $1,139.00 | Fujioki | John |
| 07-Apr-17 | $1,462.85 | Fuente | Israel |
| 07-Apr-17 | $1,517.76 | Franco | Jose |
| 07-Apr-17 | $1,274.91 | Francis | Cortney |
| 07-Apr-17 | $1,279.29 | Fong | Ronald |
| 07-Apr-17 | ($1,279.29) | Fong | Ronald |
| 07-Apr-17 | $1,142.37 | Fong | Ronald |
| 07-Apr-17 | $1,445.41 | Flores | Rina |
| 07-Apr-17 | $2,620.14 | Flores | Guadalupe |
| 07-Apr-17 | $724.48 | Flores | Eduardo |
| 07-Apr-17 | $1,145.17 | Figueroa | Maria |
| 07-Apr-17 | $3,244.53 | Ferro | Geraldo |
| 07-Apr-17 | $1,136.19 | Fernandez-Davila | Luis |
| 07-Apr-17 | $1,142.15 | Fernandez | Mauricio |
| 07-Apr-17 | $1,109.65 | Fausto | Kevin |
| 07-Apr-17 | $466.87 | Fausto | Jonathan |
| 07-Apr-17 | $1,762.83 | Evans | Kevin |
| 07-Apr-17 | $1,383.69 | Evans | Kevin |
| 07-Apr-17 | ($1,762.83) | Evans | Kevin |
| 07-Apr-17 | ($1,244.60) | Etheart | Guimy |
| 07-Apr-17 | $1,118.09 | Etheart | Guimy |
| 07-Apr-17 | $1,244.60 | Etheart | Guimy |
| 07-Apr-17 | $851.59 | Estrada | Olivia |
| 07-Apr-17 | $1,181.21 | Estrada | Jose |
| 07-Apr-17 | $991.96 | Esquivel | Marilyn |
| 07-Apr-17 | $1,358.55 | Esquivel | Byron |
| 07-Apr-17 | $1,176.61 | Espinoza-Romucho | Luis |
| 07-Apr-17 | $185.22 | Espinoza-Romucho | Luis |
| 07-Apr-17 | $1,159.04 | Espinoza | Jose |
| 07-Apr-17 | $1,783.89 | Espinoza | Francisco |
| 07-Apr-17 | $947.97 | Escobar | Jaime |
| 07-Apr-17 | $1,831.34 | Escobar | Jaime |
| 07-Apr-17 | $1,709.31 | Escamilla | Jose Jesus |
| 07-Apr-17 | $940.10 | Eo | Andrew |

**Unity Courier Service**
**Expected  Payroll to be Paid 4/7/17**
**for the payroll period ended 3/31/17**

| Payment Date | Payment Amount | Last Name | First Name |
|---|---|---|---|
| 07-Apr-17 | $1,311.69 | Enkhtur | Anar |
| 07-Apr-17 | $1,170.72 | Ejanda | Alden |
| 07-Apr-17 | $1,379.36 | Eck III | Richard |
| 07-Apr-17 | $531.00 | Eck III | Richard |
| 07-Apr-17 | $1,577.54 | Dutt | Amrit |
| 07-Apr-17 | $684.71 | Durkin | James |
| 07-Apr-17 | $1,919.03 | Duran | William |
| 07-Apr-17 | $1,405.67 | Duran | William |
| 07-Apr-17 | ($1,919.03) | Duran | William |
| 07-Apr-17 | ($2,566.12) | Dulmaa | Odon |
| 07-Apr-17 | $2,047.02 | Dulmaa | Odon |
| 07-Apr-17 | $2,566.12 | Dulmaa | Odon |
| 07-Apr-17 | $460.62 | Ducharme | Gary |
| 07-Apr-17 | $1,716.37 | Dsouza | Gabriel |
| 07-Apr-17 | $660.28 | Dominguez | Marcos |
| 07-Apr-17 | $81.33 | Dominguez | Erica |
| 07-Apr-17 | $1,985.42 | Doguiles | Marlon |
| 07-Apr-17 | $1,529.02 | Doguiles | Marlon |
| 07-Apr-17 | ($1,985.42) | Doguiles | Marlon |
| 07-Apr-17 | $447.80 | Dixon | Okori |
| 07-Apr-17 | $1,427.40 | Dipinto | Nicholas |
| 07-Apr-17 | $821.44 | Dioso | Reynaldo |
| 07-Apr-17 | $767.59 | Dioso | Igmedio |
| 07-Apr-17 | $1,610.43 | Diaz | Mario |
| 07-Apr-17 | $1,200.14 | Diaz | Mario |
| 07-Apr-17 | $798.02 | Dharma | Budhi |
| 07-Apr-17 | $683.21 | Dhaliwal | Bivek |
| 07-Apr-17 | $1,095.43 | Deng | Panatpong |
| 07-Apr-17 | $1,206.42 | Denegri | Carlos |
| 07-Apr-17 | $1,086.39 | Dela Cruz | Romulo |
| 07-Apr-17 | $536.35 | Dela Cruz | Richard |
| 07-Apr-17 | $1,687.23 | De Santiago Marroquin | Rafael A |
| 07-Apr-17 | $1,347.79 | De Santiago | Vivian |
| 07-Apr-17 | $1,720.17 | De Santiago | Rafael |
| 07-Apr-17 | $973.42 | De Ocampo | Teresa |
| 07-Apr-17 | $1,118.31 | De La Cruz | Luis |
| 07-Apr-17 | $1,041.52 | De Fretes | Max |
| 07-Apr-17 | $1,537.77 | De Caceres | Elizabeth |
| 07-Apr-17 | $57.24 | De Caceres | Elizabeth |
| 07-Apr-17 | $1,276.09 | Davis | Steve |

**Unity Courier Service**
**Expected  Payroll to be Paid 4/7/17**
**for the payroll period ended 3/31/17**

| Payment Date | Payment Amount | Last Name | First Name |
|---|---|---|---|
| 07-Apr-17 | $685.18 | Davis | Larry |
| 07-Apr-17 | $1,474.98 | Davis | Joseph |
| 07-Apr-17 | $930.09 | David | Miguel |
| 07-Apr-17 | $1,653.69 | Dasalla | Romeo |
| 07-Apr-17 | $665.76 | Darsono | Sandy |
| 07-Apr-17 | $126.14 | Dang | Joseph |
| 07-Apr-17 | $1,310.57 | Dancy | Rickey |
| 07-Apr-17 | ($1,310.57) | Dancy | Rickey |
| 07-Apr-17 | $1,190.38 | Dancy | Rickey |
| 07-Apr-17 | $1,606.27 | Dancev | Veniamin |
| 07-Apr-17 | $1,440.41 | Dancev | Vasili |
| 07-Apr-17 | $896.18 | Damer | Mamoun |
| 07-Apr-17 | $700.12 | Cross | Robert |
| 07-Apr-17 | $598.34 | Cross | Robert |
| 07-Apr-17 | ($700.12) | Cross | Robert |
| 07-Apr-17 | $1,323.22 | Crisanto | Miguel |
| 07-Apr-17 | $1,069.14 | Crawford Jr. | Kenneth |
| 07-Apr-17 | $1,412.30 | Covanan | Narongsak |
| 07-Apr-17 | $868.06 | Covaliuc | Mariana |
| 07-Apr-17 | $1,092.38 | Cova | Saul |
| 07-Apr-17 | $1,206.51 | Correa-Avila | Ricardo |
| 07-Apr-17 | $1,063.75 | Coronel | Allen |
| 07-Apr-17 | $1,482.18 | Corea | Rafael |
| 07-Apr-17 | $1,334.35 | Cordero III | Floro |
| 07-Apr-17 | $610.91 | Cordero Castro | Walter |
| 07-Apr-17 | $748.81 | Cooledge | Dana |
| 07-Apr-17 | $828.03 | Cooledge | Dana |
| 07-Apr-17 | $1,612.67 | Contreras | Fredy |
| 07-Apr-17 | $462.38 | Contreras | Cynthia |
| 07-Apr-17 | $860.54 | Columbres | Melchor |
| 07-Apr-17 | $1,074.57 | Cole | Aaron |
| 07-Apr-17 | $3,004.30 | Coello-Maldonado | Bryan |
| 07-Apr-17 | $574.99 | Cobarrubias | Jorge |
| 07-Apr-17 | $967.85 | Clement | Mary |
| 07-Apr-17 | $861.21 | Clark | Tina |
| 07-Apr-17 | $1,170.25 | Cisneros | Oswaldo |
| 07-Apr-17 | $1,737.39 | Cisneros | Gerardo |
| 07-Apr-17 | $1,453.81 | Cifuentes | Mynor |
| 07-Apr-17 | $1,219.00 | Chuon | Chann |
| 07-Apr-17 | $953.91 | Chrun | Savoeun |

Copy of Unity FDay Wage Exhibit 1 04 04 17 fnl.1.xlsx In re Unity Courier Service, Inc.
Case No. 2:17-bk-13943-ER    22  of 28
Page 35 of 90

**Unity Courier Service**
**Expected  Payroll to be Paid 4/7/17**
**for the payroll period ended 3/31/17**

| Payment Date | Payment Amount | Last Name | First Name |
|---|---|---|---|
| 07-Apr-17 | $791.35 | Christopher | Anthony |
| 07-Apr-17 | $1,119.40 | Christianson | Katherine Mary |
| 07-Apr-17 | $1,043.54 | Christianson | Katherine Mary |
| 07-Apr-17 | ($1,119.40) | Christianson | Katherine Mary |
| 07-Apr-17 | $1,210.47 | Chorna | Hanna |
| 07-Apr-17 | $2,173.61 | Chevez | Francisco |
| 07-Apr-17 | $1,799.22 | Chevez | Francisco |
| 07-Apr-17 | ($2,173.61) | Chevez | Francisco |
| 07-Apr-17 | $883.13 | Cheramath | Opas |
| 07-Apr-17 | $291.52 | Cheng | Kon-Tiki |
| 07-Apr-17 | $1,311.18 | Cheng | Kon-Tiki |
| 07-Apr-17 | $1,550.42 | Chavez, Jr | Marco |
| 07-Apr-17 | $869.90 | Chavez | Salvador |
| 07-Apr-17 | $1,251.45 | Chavez | Pedro |
| 07-Apr-17 | $1,008.67 | Chavez | Miguel |
| 07-Apr-17 | $937.12 | Chavez | Miguel |
| 07-Apr-17 | ($1,008.67) | Chavez | Miguel |
| 07-Apr-17 | $982.71 | Chavez | Benjamin |
| 07-Apr-17 | $1,332.80 | Chavarria | Leonel |
| 07-Apr-17 | $1,173.99 | Chavarria | Damaris |
| 07-Apr-17 | ($1,173.99) | Chavarria | Damaris |
| 07-Apr-17 | $1,043.52 | Chavarria | Damaris |
| 07-Apr-17 | $592.59 | Chaube | Ralesh |
| 07-Apr-17 | ($948.14) | Chaube | Ralesh |
| 07-Apr-17 | $948.14 | Chaube | Ralesh |
| 07-Apr-17 | $1,492.51 | Charoenphong | Buncha |
| 07-Apr-17 | $816.12 | Chansila | Prawat |
| 07-Apr-17 | $271.30 | Chand | Avikash |
| 07-Apr-17 | $2,051.92 | Chand | Avikash |
| 07-Apr-17 | $835.38 | Chagolla, Jr | Robert |
| 07-Apr-17 | $1,102.64 | Cerpas Torres | Mario |
| 07-Apr-17 | $1,291.95 | Cerpas Torres | Mario |
| 07-Apr-17 | ($1,102.64) | Cerpas Torres | Mario |
| 07-Apr-17 | $1,262.07 | Cernioglo | Victor |
| 07-Apr-17 | $1,143.34 | Cerda | Antonio |
| 07-Apr-17 | $1,133.34 | Cepeda-Salazar | Gerardo |
| 07-Apr-17 | $452.96 | Centeno | Dave |
| 07-Apr-17 | $1,142.17 | Celario | Jesusito |
| 07-Apr-17 | $1,377.07 | Cecena-Hernandez | Hernan |
| 07-Apr-17 | $1,064.19 | Cazares | Anthony |

**Unity Courier Service**
**Expected  Payroll to be Paid 4/7/17**
**for the payroll period ended 3/31/17**

| Payment Date | Payment Amount | Last Name | First Name |
|---|---|---|---|
| 07-Apr-17 | $900.84 | Castro | Roberto |
| 07-Apr-17 | $1,326.57 | Castro | Juan |
| 07-Apr-17 | $1,505.53 | Castro | Javier |
| 07-Apr-17 | $1,320.15 | Castillo | Sergio |
| 07-Apr-17 | $1,043.68 | Castillo | Jose |
| 07-Apr-17 | $1,718.94 | Castilla | Lidia |
| 07-Apr-17 | $724.16 | Castellanos | Jesse |
| 07-Apr-17 | $114.42 | Castellanos | Jesse |
| 07-Apr-17 | $1,469.50 | Casas | Israel |
| 07-Apr-17 | $1,205.69 | Carrera | Mario |
| 07-Apr-17 | $967.43 | Carrera | Edgar |
| 07-Apr-17 | $1,337.72 | Carr | Monique |
| 07-Apr-17 | $822.78 | Caro Santiago | Maria de Jesus |
| 07-Apr-17 | ($1,286.31) | Carlos | Cesar |
| 07-Apr-17 | $1,010.12 | Carlos | Cesar |
| 07-Apr-17 | $1,286.31 | Carlos | Cesar |
| 07-Apr-17 | $317.26 | Carey Gonzalez | Vaida |
| 07-Apr-17 | $1,223.80 | Carey Gonzalez | Vaida |
| 07-Apr-17 | $817.09 | Carbajal | Alexander |
| 07-Apr-17 | $894.25 | Canahui Lopez | Julieta |
| 07-Apr-17 | $935.73 | Calderon | Ronald |
| 07-Apr-17 | $1,594.88 | Calderon | Jose |
| 07-Apr-17 | $1,623.50 | Calderon | Hugo |
| 07-Apr-17 | $1,434.05 | Cabrera | Miguel |
| 07-Apr-17 | $1,480.49 | Cabrera | Liliana |
| 07-Apr-17 | $1,839.43 | Cabrera | Carlos |
| 07-Apr-17 | $878.58 | Caballero | Maria Elena |
| 07-Apr-17 | $732.71 | Caballero | Maria Elena |
| 07-Apr-17 | ($878.58) | Caballero | Maria Elena |
| 07-Apr-17 | $850.06 | Byll | Brent |
| 07-Apr-17 | $1,190.69 | Bucio | Efrain |
| 07-Apr-17 | $1,403.22 | Brown | Jeff |
| 07-Apr-17 | $1,207.50 | Brown | James |
| 07-Apr-17 | $1,249.49 | Briano | Julian |
| 07-Apr-17 | $1,162.08 | Brantley | Apollo |
| 07-Apr-17 | $1,584.41 | Bootchot | Chadchai |
| 07-Apr-17 | $2,411.84 | Boonma | Somchai |
| 07-Apr-17 | ($2,411.84) | Boonma | Somchai |
| 07-Apr-17 | $1,671.09 | Boonma | Somchai |
| 07-Apr-17 | $1,130.95 | Bonifacio | Armando |

**Unity Courier Service**
**Expected  Payroll to be Paid 4/7/17**
**for the payroll period ended 3/31/17**

| Payment Date | Payment Amount | Last Name | First Name |
|---|---|---|---|
| 07-Apr-17 | $1,548.00 | Boldmyagmar | Chinzorig |
| 07-Apr-17 | $860.08 | Bojorquez | Edith |
| 07-Apr-17 | $1,399.98 | Bohannon Jr. | James |
| 07-Apr-17 | $535.31 | Blas | Remedios |
| 07-Apr-17 | $1,037.79 | Blanche Jr | Samuel |
| 07-Apr-17 | $1,620.51 | Bhatt | Bhavna |
| 07-Apr-17 | $1,918.91 | Bhamra | Manmohan |
| 07-Apr-17 | $1,031.08 | Bhakti | Suko |
| 07-Apr-17 | $1,273.90 | Beteta | Maria |
| 07-Apr-17 | $35.00 | Beteta | Maria |
| 07-Apr-17 | $1,283.72 | Beteta | Maria |
| 07-Apr-17 | ($1,273.90) | Beteta | Maria |
| 07-Apr-17 | $1,651.84 | Bermejo | Miguel |
| 07-Apr-17 | $1,001.01 | Beltran | Ricardo |
| 07-Apr-17 | $1,235.32 | Belton | Lehman |
| 07-Apr-17 | $1,385.79 | Bell | Marcelo |
| 07-Apr-17 | $1,577.56 | Belkebir | Farid |
| 07-Apr-17 | ($1,577.56) | Belkebir | Farid |
| 07-Apr-17 | $1,398.36 | Belkebir | Farid |
| 07-Apr-17 | $897.86 | Belay | Esmael |
| 07-Apr-17 | $1,084.81 | Beivide | Teresa |
| 07-Apr-17 | $987.74 | Beivide | Segundo |
| 07-Apr-17 | $851.14 | Bautista | Raymond |
| 07-Apr-17 | $779.53 | Basquez Jr. | Michael |
| 07-Apr-17 | ($779.53) | Basquez Jr. | Michael |
| 07-Apr-17 | $723.39 | Basquez Jr. | Michael |
| 07-Apr-17 | $2,229.26 | Barros | Jose |
| 07-Apr-17 | $1,192.81 | Barrios-Ordonez | Blanca |
| 07-Apr-17 | $76.81 | Barrios-Ordonez | Blanca |
| 07-Apr-17 | $889.83 | Bandi | Tumenjargal |
| 07-Apr-17 | $1,394.04 | Bal | Jasveer |
| 07-Apr-17 | $1,285.34 | Bakhtani | Najibullah |
| 07-Apr-17 | $1,223.79 | Baires | Jose |
| 07-Apr-17 | $1,375.61 | Badar | Farhan |
| 07-Apr-17 | $598.54 | Ayhuan | Tonny |
| 07-Apr-17 | $536.33 | Ayala | Marco |
| 07-Apr-17 | $788.57 | Ayala | Guillermo |
| 07-Apr-17 | $1,157.11 | Avila | John |
| 07-Apr-17 | $940.51 | Atwal | Parmjit |
| 07-Apr-17 | $1,516.86 | Atwal | Dilawar |

**Unity Courier Service**
**Expected Payroll to be Paid 4/7/17**
**for the payroll period ended 3/31/17**

| Payment Date | Payment Amount | Last Name | First Name |
|---|---|---|---|
| 07-Apr-17 | $648.15 | Atwal | Dilawar |
| 07-Apr-17 | ($1,516.86) | Atwal | Dilawar |
| 07-Apr-17 | $1,599.05 | Atrat | Dustin |
| 07-Apr-17 | $1,232.66 | Arzola-Mendez | Fermin |
| 07-Apr-17 | $52.59 | Arroyo | John |
| 07-Apr-17 | $451.73 | Arroyo | John |
| 07-Apr-17 | $1,562.87 | Arriaga Acosta | Francisco |
| 07-Apr-17 | $2,110.83 | Arreola-Rubio | Misael |
| 07-Apr-17 | $1,071.85 | Arias-Parra | Jose |
| 07-Apr-17 | $1,463.19 | Arguello | Mauricio |
| 07-Apr-17 | $1,550.39 | Arguello | Ivette |
| 07-Apr-17 | $689.48 | Arevalo Valladares | Christian |
| 07-Apr-17 | $52.37 | Arevalo Valladares | Christian |
| 07-Apr-17 | ($2,655.53) | Arcos | Oscar |
| 07-Apr-17 | $1,744.19 | Arcos | Oscar |
| 07-Apr-17 | $2,655.53 | Arcos | Oscar |
| 07-Apr-17 | $1,002.60 | Arbuckle | Glen |
| 07-Apr-17 | $852.59 | Araya Ramirez | Juan |
| 07-Apr-17 | $1,034.62 | Arauz | Juan |
| 07-Apr-17 | $1,994.99 | Araujo Gonzalez | Luis |
| 07-Apr-17 | $593.14 | Apodaca-Barraza | Jose |
| 07-Apr-17 | $786.20 | Apelian | Jirair |
| 07-Apr-17 | $1,735.09 | Aojalla | Ricardo |
| 07-Apr-17 | $1,346.92 | Anzora | Antonio |
| 07-Apr-17 | $813.44 | Andrade Lozoya | Jose |
| 07-Apr-17 | $1,188.77 | Andrade | Roberto |
| 07-Apr-17 | $1,754.91 | Amezcua | Recardo |
| 07-Apr-17 | $651.35 | Amartsitu | Vladimir |
| 07-Apr-17 | $321.91 | Amartsitu | Vladimir |
| 07-Apr-17 | $1,200.88 | Amaral | Cintia |
| 07-Apr-17 | $2,172.98 | Amador | Raul |
| 07-Apr-17 | $624.96 | Alvarez Noriega | Jose |
| 07-Apr-17 | $1,412.37 | Alvarez | Nilton |
| 07-Apr-17 | $1,530.88 | Alvarado-Santana | Dixon |
| 07-Apr-17 | $795.60 | Alvarado Kestler | German |
| 07-Apr-17 | $303.73 | Alvarado | Jacqueline |
| 07-Apr-17 | $1,496.66 | Alva | Hugo |
| 07-Apr-17 | $649.36 | Ali | Chaudhary |
| 07-Apr-17 | $3,266.75 | Ali | Chaudhary |
| 07-Apr-17 | $792.71 | Aleman | Jose |

**Unity Courier Service**
**Expected  Payroll to be Paid 4/7/17**
**for the payroll period ended 3/31/17**

| Payment Date | Payment Amount | Last Name | First Name |
|---|---|---|---|
| 07-Apr-17 | $1,308.17 | Akbaryar | Wadood |
| 07-Apr-17 | $1,064.28 | Ahmed | Bilal |
| 07-Apr-17 | $1,295.18 | Aguinaga | Theresa |
| 07-Apr-17 | $938.30 | Aguilar | Yanira |
| 07-Apr-17 | $1,874.74 | Aguilar | Joel |
| 07-Apr-17 | $1,461.68 | Aguayo | Ruben |
| 07-Apr-17 | $672.30 | Aguayo | Ramon |
| 07-Apr-17 | $680.10 | Acevedo Perez | Carolina |
| 07-Apr-17 | $673.48 | Acenita | Eduardo |
| 07-Apr-17 | $626.04 | Abuda | Ruel |
| 07-Apr-17 | $1,253.98 | Abonce-Lira | Guadalupe |
| 07-Apr-17 | $1,010.22 | Aben | Ferdinand |
| 07-Apr-17 | $1,016.60 | Aben | Ferdinand |
| 07-Apr-17 | ($1,010.22) | Aben | Ferdinand |
| 07-Apr-17 | $705.35 | Abdulwase | Hadi |
| 07-Apr-17 | $1,332.99 | Abdulqawi | Badr |
| 07-Apr-17 | ($1,332.99) | Abdulqawi | Badr |
| 07-Apr-17 | $1,189.75 | Abdulqawi | Badr |
| 07-Apr-17 | $409.07 | Abdisalan | Abdirahman M. |
| 07-Apr-17 | $937.19 | Abdalla | Mustafa |
| | | | |
| | $1,034,620.41 | $1,034,620.41 | |

**Outstanding Checks**        **$113,452.97**        **$113,452.97**
**to Current Employees:**

### Sub-Contractors

| | |
|---|---|
| Silver State Courier | 3,341.00 |
| Central Courier | 6,250.00 |
| Eite Delivery Service | 2,750.00 |
| Swift Couriers | - |
| Russell Couriers | 6,000.00 |
| S&P Couriers | 3,400.00 |
| Silver City Couriers | 3,000.00 |
| Southwest Courier | 4,000.00 |
| WPX Couriers | 330.00 |
| 24 Hour Express | 525.00 |
| David Riviera | 760.00 |
| | **30,356.00**        **$30,356.00** |

**Unity Courier Service**
**Expected  Payroll to be Paid 4/7/17**
**for the payroll period ended 3/31/17**

| Payment Date | Payment Amount | Last Name | First Name |
|---|---|---|---|
| **Total Expected Payments** | **$1,178,429.38** | **$1,178,429.38** | |
| | | | |
| **Expected Payroll Taxes** | | | |
| **Federal and State** | **$239,787.43** | **$239,787.43** | |
| | | | |
| **Expected Garnishments** | **$3,243.05** | **$3,243.05** | |
| | | | |
| **Total Expected Payroll** | | | |
| **Related Expenses** | **$1,421,459.86** | **$1,421,459.86** | |
| | | | |
| **Requested Excess Cushion,** | | | |
| **Due to Estimated Payments:** | **$25,000.00** | **$25,000.00** | |
| | | | |
| **TOTAL REQUESTED FOR APPROVAL:** | | **$1,446,459.86** | |

EXHIBIT 2

**Unity Courier Service, Inc**
**Estimated Assets & Liabilities**
**as of March 31, 2017**

**Assets**

| | |
|---|---:|
| Cash &  Equivalents | 23,017 |
| Accounts Receivables | 3,264,436 |
| Prepaid Insurance | 376,921 |
| Furniture & Equipment | 88,479 |
| Other-Notes Receivables | 265,755 |
| **Total Assets** | **4,018,608** |

**Liabilities**

| | |
|---|---:|
| Accounts Payable | 839,030 |
| Accrued Payroll Liabilities | 1,473,714 |
| Notes Payable-Steve Lopez | 200,000 |
| Camco Commission (a) | 1,236,684 |
| **Total Liabilities** | **3,749,428** |

(a)
Unity Courier entered into a commission agreeement with
Camco Resources on for the purchase of a customer
list.  Commissions were paid over recent years reducing an
original amount owed of $3,000,000.  Commissions were paid
monthly and the present balance owed is $1,236,684.
The payable to Camco Resources is not reflected on the balance
sheet and is normally presented in the notes to the financials.
Unity Courier does not presently prepare notes to the financials
as it is not required for internal financial statement presentation
to the owners.   It is shown here to present the balance owed to
Camco Resources.

EXHIBIT 3

## SECURITY AGREEMENT

This Security Agreement is made and entered into as of March 21, 2013, by and among **Unity Courier Service Inc.,** a California corporation ("**Obligor**") in favor of **CAMCO RESOURCES, LLC,** a Nevada limited liability company, or his designated assigns ("**Secured Party**"), with an address of 871 Coronado Center Drive., Ste 200, Henderson NV, 89502 to record the grant of a security interest in all of the tangible and intangible assets of Obligor as further described herein. Obligor and Secured Party are sometimes each referred to herein as a "**Party**", and collectively, as the "**Parties**".

## RECITALS

A.   Contemporaneously herewith, Obligor and Secured Party have entered into that certain Commission Agreement (the "**Agreement**") whereby Obligor is required to make certain payments to Secured Party in exchange for Secured Party agreeing to permit Transferor (as defined in the Agreement) to transfer certain business assets and interests to Obligor (the "**Transfer**").

B.   To further protect the interests of the Secured Party and to induce Secured Party to enter into the Agreement, Obligor has agreed to grant a security interest in all of its assets to secure its obligations to Secured Party.

## AGREEMENT

For value received, and to induce Transferor to enter into the Agreement and permit the Transfer, the Parties hereby agree as follows:

1.     **Definitions.** Unless otherwise defined herein or unless the context otherwise requires, terms used in this Agreement, including its preamble and recitals, have the meanings provided in the Uniform Commercial Code in effect in the State of California (the "**UCC**"). In addition, the following terms when used in this Agreement, including its recitals, shall have the following meanings:

a.     "**Transaction Documents**" shall mean (i) this Security Agreement, (ii) the Commission Agreement, (iii) the UCC-1 statements filed in connection herewith, and (iv) any other documents delivered to Transferor and/or Secured Party in connection with the Commission Agreement.

b.     "**Collateral**" shall mean (a) all of the tangible and intangible assets of Obligor, including but not limited to cash, accounts receivable, inventory, copyrights, trademarks, tradenames, patents, contract rights and customer lists and (b) all Proceeds derived from the foregoing assets. The Collateral is more fully described on Exhibit A hereto.

c.     "**Governmental Authority**" shall mean the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

1

d.    **"Lien"** shall mean any mortgage, pledge, security interest, lien (statutory or otherwise), charge, encumbrance, hypothecation, assignment, deposit arrangement, or other arrangement having the practical effect of the foregoing (including any conditional sale or other title retention agreement and any capital lease having the same economic effect as any of the foregoing).

e.    **"Obligations"** shall mean all amounts owed by Obligor to Secured Party under the Transaction Documents.

f.    **"Permitted Encumbrances"** shall mean (i) Liens imposed by law for taxes and other governmental charges not yet delinquent or which are being contested in good faith by appropriate proceedings and with respect to which adequate reserves are being maintained in accordance with GAAP; (ii) Liens of landlords and Liens of carriers, warehousemen, mechanics, materialmen and other Liens imposed by law or contract created in the ordinary course of business for amounts not yet due or which are being contested in good faith by appropriate proceedings and with respect to which adequate reserves are being maintained in accordance with GAAP; (iii) pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations; (iv)   deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

g.    **"Person"** shall mean any individual, partnership, firm, corporation, association, joint venture, limited liability company, trust or other entity, or any Governmental Authority.

h.    **"Proceeds"** means rights arising out of the Collateral and whatever is acquired, received, collected or distributed on account of the Collateral or on the sale, lease, license, holding, exchange, collection, liquidation or other disposition of the Collateral.

i.    **"UCC"** means the Uniform Commercial Code of the State of California or any successor statute or, when the laws of another jurisdiction governs the method or manner of the creation of any security interest in any of the Collateral, the Uniform Commercial Code (or any successor statute) of that jurisdiction.

**2.    Grant and Perfection of Security Interest.** To secure the full and punctual payment and performance of the Obligations, Obligor hereby grants to Secured Party a continuing and unconditional security interest in the Collateral. From time to time at the request of Secured Party, Obligor shall execute, deliver, file, and record all assignments, notices of lien, financing statements, continuation statements, statements of change, certificates of title, patents, copyrights and trademark filings and other documents, pay the cost of preparing, processing, and filing or recording them in every place specified by Secured Party, and do all other acts and things as Secured Party may request from time to time to create, perfect, and preserve a valid security interest in the Collateral, free from all other Liens, except as expressly allowed in writing by Secured Party or as permitted under this Security Agreement, to secure the full and punctual payment and performance of the Obligations or to enable Secured Party to exercise and enforce its rights and powers under this Security Agreement with respect to the Collateral.

2

Secured Party shall furnish to Obligor a copy of any UCC financing or continuation statement filed by Secured Party with respect to the security interests granted by this Security Agreement.

At the request and option of Secured Party, Obligor shall use all commercially reasonable efforts to take any and all reasonable action requested by Secured Party that is necessary or useful for the attachment, perfection, and priority of, and the ability of Secured Party to enforce, Secured Party's security interest in any and all of the Collateral, including (a) obtaining (in form and substance reasonably acceptable to Secure Party) all waivers, consents, and approvals from each person that Secured Party deems reasonably necessary, (b) executing, delivering, and, where appropriate, filing statements and related amendments under the UCC, to the extent if any, that any Obligor's signature is required, (c) complying with any law, if compliance with the law is a condition to the attachment, perfection, or priority of, or ability of Secure Party to enforce, its security interest in that Collateral, and (d) causing Secured Party's name to be noted as secured party on any certificate of title for a titled good if the notation is a condition to the attachment, perfection, or priority of, or ability of Secure Party to enforce its security interest in that Collateral.

All of the rights of the Secured Party in this Security Agreement are intended to be in addition to and not to diminish any rights granted to the Secured Party in the Collateral under the Commission Agreement.

**3.    Representations and Warranties.** Obligor represents and warrants that as of the date of this Security Agreement:

a.    Obligor has the authority to grant to Secured Party a security interest in the Collateral pursuant to this Security Agreement;

b.    Obligor has not filed any financing statements in any public office covering any of the Collateral (except for the Liens to be satisfied with the proceeds of the Note);

c.    Obligor is the sole legal and equitable owner of all the Collateral, except for the security interests granted to Secured Party in this Security Agreement;

d.    This Security Agreement has been duly authorized, executed, and delivered on behalf of Obligor and constitutes a valid and binding agreement that is enforceable against Obligor by Secured Party in accordance with its terms, except to the extent limited by bankruptcy, insolvency, debtor relief, and other laws of general application affecting the enforcement of creditors' rights and debtors' obligations;

e.    The Collateral is free and clear of all Liens, charges, and assessments of every kind and nature, except for: (i) liens for taxes and assessments of governmental authorities that are not yet due and for which adequate reserves are recorded in Obligor's books of account; (ii) security interests granted in favor of Secured Party or allowed in writing by Secured Party (iii) and other liens that have been approved in writing by Secured Party;

f.    Obligor's chief executive offices and the places where Obligor keeps the Collateral and all the records pertaining to the Collateral are at the addresses of Obligor listed in Section 13 of this Security Agreement hereto;

3

g.    The exact legal name and state of organization of Obligor is as set forth in the first paragraph of this Security Agreement, and Obligor does not transact any business under any name other than the exact legal name set forth in the first paragraph of this Security Agreement; and

h.    The execution, delivery, and performance of this Security Agreement by Obligor: (i) has been duly authorized by all requisite corporate action of Obligor; (ii) will not result in the creation of any Lien on any property of Obligor (other than the security interests created pursuant to this Security Agreement); (iii) will not contravene the articles of incorporation or bylaws or articles of formation or company agreement, as applicable, of Obligor; (iv) does not require any consent, filing, approval, or other action by or with any Person; (v) will not accelerate the maturity or time for performance of any indebtedness of Obligor; and (vi) will not constitute a breach, a default, or an event that (with notice, lapse of time, or both) would be a breach or default, under any order, decree, lease, judgment, agreement, or instrument to which Obligor is a party or otherwise subject.

**4.    Affirmative Covenants.** Until the Obligations have been paid in full, Obligor shall (a) furnish to Secured Party any information received by Obligor pertaining to claims made by third parties to the Collateral, (b) promptly notify Secured Party after Obligor learns of any event that would constitute an Event of Default, (c) promptly pay all indebtedness in accordance with the terms of the Note, (d) conduct and maintain their affairs and business according to their usual and ordinary course, maintain themselves at all times as a legal entity organized and existing in good standing under the laws of their respective States of organization, and comply with all laws applicable to the Collateral, (e) keep books, records, and accounts that fairly reflect all dealings and transactions related to the Collateral and to Obligor's business and activities, permit Secured Party or its agents or representatives, at any time during normal business hours, to copy, examine, and make extracts from all of Obligor's records pertaining to the Collateral, and compile, prepare, and furnish to Secured Party all data, reports, schedules, information, and certificates concerning the Collateral as Secured Party may reasonably request from time to time, (f) promptly pay all filing, recording, and certification fees and charges and other direct costs incurred by Secured Party to perfect the security interests created by this Security Agreement, whether incurred before or after the date of this Security Agreement, (g) maintain insurance on the Collateral against all risks to which the Collateral may be exposed, with all such insurance policies to name Secured Party as an additional insured and loss payee as its interests may appear, (h) defend their title or interest in the Collateral against any and all Liens, charges, offsets, defenses, and assessments of every kind and nature, except for Permitted Encumbrances and for Liens which are permitted under the Transaction Documents, and (i) perform their obligations, under each material contract and other agreement constituting part of the Collateral to ensure that no breach, default, or event of default will occur under such contract or agreement.

Obligor acknowledges that Secured Party has no obligation to preserve the Collateral or to pay taxes, assessments, insurance premiums, and indebtedness secured by a Lien on the Collateral. Any payments made by Secured Party or actions taken by Secured Party to preserve the Collateral will not constitute a cure or waiver of any Default. Additionally, Obligor confirms to Secured Party that Obligor bears all risk of loss associated with the Collateral and that Secured Party has no duty to collect any income accruing on the Collateral or to preserve any rights relating to the Collateral.

**5.    Negative Covenants.** Without the prior written consent of Secured Party, which it may withhold in its sole discretion, and except as expressly permitted by the Note, Obligor shall not:

a.    Take any action or fail to take any action that will impair the rights of Secured Party in the Collateral;

b.    Use the Collateral, or permit it to be used, in violation of any law, agreement, or policy of insurance;

c.    Sell, lease, license, transfer, or otherwise dispose (or offer to do so) of any of the Collateral or any interest in it except in the ordinary course of its business;

d.    Grant or transfer any Lien, pledge, mortgage, restriction, security interest, or other encumbrance on any of the assets of the Obligor, except as permitted under the Transaction Documents;

e.    Enter into any contract, arrangement, or commitment (oral or written) that is reasonably likely to have a material adverse effect on Obligor's duties or the rights of Secured Party under the Transaction Documents, or that limits, abrogates, or is inconsistent with any of the Transaction Documents;

f.    Except for Permitted Encumbrances and as otherwise permitted under the Transaction Documents: (i) borrow on the security of the Collateral from anyone except Secured Party; (ii) pledge or grant a Lien on the Collateral to anyone except Secured Party; (iii) permit any levy on the Collateral pursuant to legal process; or (iv) permit any lien, security interest, or encumbrance to attach to any of the Collateral, except for security interests in favor of Secured Party or expressly allowed in writing by Secured Party;

g.    Breach or default under the terms of any other agreement between Secured Party and Obligor, except for breaches or defaults which are cured under any applicable cure period; or

h.    Sell, assign, convey, pledge, transfer, hypothecate, or in any other way encumber or dispose of any Collateral, except in the ordinary course of its business or as permitted under the Transaction Documents, without the advance written approval of Secured Party (which it may withhold in its sole discretion), except for the security interests granted to Secured Party in this Security Agreement.

**6.    Secured Party Rights.** Secured Party may elect (but is not obligated) to do any of the following at any time and from time to time: (a) receive or release other security for payment of any of the Obligations; (b) release any party primarily or secondarily liable for payment of any of the Obligations; (c) apply any other security held by it to the satisfaction of the Obligations; and (d) except for Liens otherwise permitted under the Transaction Documents, discharge any Lien on the Collateral that not been expressly allowed in writing by it and pay the costs of insuring, maintaining, and preserving the Collateral; in each case without prejudice to any of its rights under this Security Agreement.

7.     **Rights with Respect to Collateral.** As long as an Event of Default (as defined in Section 8 below) has not occurred and is not continuing, Obligor may use and sell the Collateral in the ordinary course of its business. If an Event of Default has occurred, and until the Obligations have been fully paid, Obligor shall hold all cash or other property that they receive as a payment or other distribution in respect of the Collateral under an express trust for the sole benefit of Secured Party and deliver that cash or other property to Secured Party within 48 hours after Obligor receives it, in the form received (except for any endorsement or assignment required to transfer it to Secured Party), for application to payment of the Obligations.

8.     **Events of Default.** The occurrence of any event that constitutes an Event of Default as set forth in any of the Transaction Documents shall constitute a Default under this Security Agreement. In addition, the following events or conditions shall constitute a Default: (a), a levy, execution, or attachment on any of the Collateral by a third party other than Lender; (b) the transfer or disposition of any Collateral, except as expressly permitted by this Security Agreement or the other Transaction Documents; or (c) except as otherwise permitted under the Transaction Documents, Secured Party at any time receives a report from a Governmental Authority indicating that Secured Party's security interest in some or all of the Collateral is not prior to all other security interests or other interests reflected in the report, and such situation is not cured within ten (10) days following written notice by Secured Party to Obligor of such situation.

9.     **Default Remedies.** At any time after a Default, Secured Party may elect (but is not obligated) to do any of the following:

    a.     Upon written notice to Obligor, accelerate the maturity date of the Obligations and declare them to be immediately due and payable; and

    b.     Exercise from time to time all rights and remedies of a secured creditor under applicable law, including the UCC.

Secured Party shall notify Obligor (either concurrently or promptly thereafter) of any of the preceding actions taken by it, but its failure to do so will not affect the validity of any action taken by it or any of its rights or interests under this Security Agreement.

Secured Party may exercise any of its rights or remedies serially, wholly, partially, or collectively, and the exercise of any one right does not preclude the exercise of any other right. Secured Party has no obligation to attempt to satisfy the Obligations by collecting from any other Person, and Secured Party may release, modify, or waive any collateral provided by another person to secure any of the Obligations without affecting in any manner Secured Party's rights against Obligor or the Collateral. Obligor waives any right they might have to require Secured Party to pursue any person for any of the Obligations. Obligor waives any and all rights that they might have to a judicial hearing in advance of the enforcement of any of Secured Party's rights and remedies under this Security Agreement, including Secured Party's right after an Event of Default to take immediate possession of the Collateral to exercise Secured Party's rights and remedies with respect to the Collateral.

6

After a Default, Obligor, at their sole expense and at Secured Party's request, shall assemble any Collateral that is not in Secured Party's possession and make it available to Secured Party at a convenient place acceptable to Secured Party. **Any notice of sale, disposition, or other intended action by Secured Party that is given to Obligor at the address for Obligor listed in this Security Agreement at least ten days before the action is taken will constitute reasonable notice of disposition to Obligor.** Secured Party may sell the Collateral without giving any warranties as to the Collateral and may specifically disclaim warranties of title and other warranties without adversely affecting the commercial reasonableness of any sale or other disposition of the Collateral.

Secured Party is not obligated to resort to any Collateral or other assurances of payment in any particular order. Secured Party may apply any Proceeds from a disposition of any of the Collateral toward payment of any of the Obligations, in such order of application as Secured Party elects in its sole discretion, and Obligor is liable to Secured Party for any deficiency between the Proceeds realized on any disposition of the Collateral and the amount of Obligations remaining unpaid. Obligor promptly shall pay to Secured Party, on demand, all costs incurred by Secured Party in connection with the enforcement, interpretation, and administration of its rights under this Security Agreement.

Obligor shall remain liable for any deficiency if the proceeds of any sale or disposition of the Collateral are insufficient to pay all amounts to which Secured Party is entitled, including all costs and expenses that Secured Party is permitted to deduct from such proceeds pursuant to this Security Agreement and all reasonable fees and disbursements of any attorneys employed by Secured Party to collect such deficiency.

**10.**    **Power of Attorney.** Obligor irrevocably appoints Secured Party as its agent and attorney-in-fact with full power and authority and with full power of substitution, **whether or not any Default exists,** to sign on behalf of Obligor any registration, notice of lien, financing statement, or other document covering the Collateral as Secured Party reasonably considers necessary in its sole discretion to create, perfect, and preserve a valid security interest in the Collateral in favor of Secured Party, and, **after a Default,** to do any of the following as fully as Obligor lawfully might do:

a.    At Secured Party's sole expense and to make claims with respect to the Collateral under any insurance policy of Obligor and to otherwise act to collect any insurance proceeds with respect to the Collateral;

b.    Exchange, surrender, or substitute any Collateral;

c.    Renew or extend any liability owing to Obligor under any Collateral;

d.    Defend, settle, prosecute, or compromise any claim, action, or proceeding with respect to the Collateral;

e.    Sell, assign, pledge, endorse, transfer, grant a security interest in, and make any agreement with respect to, any of the Collateral; and

7

f.      Demand, collect, receive, and apply to any of the Obligations, in any order of application that Secured party elects in its sole discretion, all Proceeds and payments or monies due or to become due to Obligor in respect of the Collateral.

This power of attorney is a power coupled with an interest. Secured Party is under no duty to exercise or withhold the exercise of any of the rights, powers, privileges, and options expressly or implicitly granted to Secured Party in this Security Agreement and is not liable for any failure to do so or any delay in doing so. Secured Party is not liable for any act, mistake, omission, or error of judgment in its individual capacity or in its capacity as attorney-in-fact except acts or omissions resulting from its willful misconduct.

**11.     Termination.** This Security Agreement and the security interests of Secured Party under it will terminate when all the Obligations have been paid in full in cash, but only if Obligor does not file (and none of the creditors of Obligor file against it), within 91 calendar days after the first date when all the Obligations are paid and performed in full, a petition seeking relief under any bankruptcy, insolvency, reorganization, or debtor relief law and a claim for recovery or repayment of any amount paid on the Obligations or for avoidance of any security interest in the Collateral. An affidavit or written statement of Secured party, or any duly appointed agent or attorney-in-fact for Secured Party, that shows or asserts that any of the Obligations remain unpaid will constitute presumptive evidence of the continuing effectiveness of this Security Agreement and the security interests of Secured Party under it, and any interested person is authorized to rely on it. When all of the Obligations have been fully paid, Secured Party promptly shall assign, endorse, deliver and transfer to Obligor, against receipt, without recourse to or warranty by Secured Party, any and all Collateral (if any) that is then held by Secured Party under this Security Agreement and has not been sold or otherwise applied pursuant to the terms of this Security Agreement. On termination of this Security Agreement and at the request and at the expense of Obligor, Secured Party shall terminate all effective financing statements in favor of Secured Party that are then on file or recorded with respect to the Collateral.

**12.     Legal Proceedings.** The validity, construction, interpretation, and enforceability of this Security Agreement are governed by the laws of the State of Nevada except to the extent the UCC provides for the application of the law of another state. Obligor consents to the personal jurisdiction of the state and federal courts in the State of Nevada, stipulates that the proper and convenient venue for any legal proceeding between them that pertains to either this Security Agreement or any of the Collateral is District Court of the State of Nevada located in Las Vegas, Nevada and waives any defenses, whether asserted by motion or pleading, that this venue is improper or inconvenient. Notwithstanding the above, Secured Party may, in its discretion, also institute a legal proceeding against Obligor in any location where the collateral is located.

Except as expressly prohibited by law, Obligor waives any right they might have to claim or recover any special, exemplary, punitive, or consequential damages or any damages other than, or in addition to, actual damages. Obligor certifies that neither Secured Party, nor any agent, attorney, or representative of Secured Party has represented, expressly or otherwise, that Secured Party would not seek to enforce the foregoing waivers or other waivers contained in this Security Agreement, and acknowledge that Secured Party has relied on, among other things, the foregoing waivers and certification.

8

In any legal proceeding between Obligor and Secured Party that arises out of this Security Agreement and pertains to the validity or enforcement of this Security Agreement or Secured Party's security interests in the Collateral granted under it, the non-prevailing party will reimburse the prevailing party for all reasonable costs incurred by the prevailing party as a result of the legal proceeding. If Secured Party becomes a party to any legal proceeding arising out of this Security Agreement that is initiated by any person other than Obligor and that pertains to the validity or enforcement of this Security Agreement or Secured Party's security interests in the Collateral granted under it, Obligor shall reimburse Secured Party for all reasonable costs incurred by it in connection with the legal proceeding, regardless of who prevails.

**OBLIGOR KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ITS RIGHT TO A JURY TRIAL IN ANY LAWSUIT BY SECURED PARTY TO ENFORCE THIS AGREEMENT OR ANY OF THE OTHER TRANSACTION DOCUMENTS.**

13.    **Notices**. Any notice, consent or approval required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been delivered upon (a) hand delivery, (b) upon receipt if delivered by FedEx or another reliable overnight courier service, with receipt acknowledgment requested, or (c) upon receipt if transmitted by email, with a copy sent on the same day by one (1) of the other permitted methods of delivery, and addressed as follows or such other address as a Party may from time to time specify in writing:

(a)    Obligor:

    Unity Courier Service, Inc.
    3231 Fletcher Drive
    Los Angeles  CA  90065

(b)    Secured Party:

    Camco Resources, LLC
    871 Coronado Center Drive., Ste 200
    Henderson NV, 89502
    Attention:  Bruce Epstein

14.    **Waiver and Amendment; Assignment.**

a.    A waiver, amendment, modification, or termination of this Security Agreement will be valid and effective only if it is in writing and signed by Obligor and Secured Party. In addition, a written waiver by Secured Party of a Default under this Security Agreement will not operate as a waiver of any other Default or of a succeeding Default under the same provision or as a waiver of the provision itself. A delay, omission, or course of dealing on the part of Secured Party in exercising any right, power, or remedy will not operate as a waiver of it, except when this Security Agreement expressly requires the right, power, or remedy to be exercised within a specified time, and a single or partial exercise by Secured Party of any right, power, or remedy does not preclude any further exercise of it or the exercise of any other right, power, or remedy. Secured Party's exercise or failure to exercise any right, power, or remedy

9

does not constitute a waiver of any Default by Obligor under this Security Agreement. This Security Agreement is not assignable (by operation of law or otherwise) by Obligor without the advance written approval of Secured Party, which it may withhold in its sole discretion.

b.     The assignment of this Security Agreement by Obligor without the advance written approval of Secured Party will constitute a Default by Obligor and will be invalid and unenforceable as to Secured Party.

c.     Secured Party may assign its rights and interests under this Security Agreement, and if Secured Party assigns those rights and interests, Obligor shall render performance under this Security Agreement to the assignee.

**15.     Miscellaneous.** Time is of the essence with respect to the performance of Obligor's obligations under this Security Agreement. When any provision of this Security Agreement requires or prohibits action to be taken by a person, the provision applies regardless of whether the action is taken directly or indirectly by the person. The headings preceding the sections of this Security Agreement are solely for convenient reference and neither constitute a part of this Security Agreement nor affect its meaning, interpretation, or effect. This Security Agreement inures to the benefit of Secured Party and its assignees and successors in interest and is binding on Obligor and its assignees and successors in interest and shall bind all persons that become bound as a debtor to this Security Agreement. No reference in this Security Agreement to "**Proceeds**" authorizes any sale, transfer, or other disposition of any Collateral by Obligor except in the ordinary course of its business. Each provision of this Security Agreement should be construed and interpreted so it is valid and enforceable under applicable law. If a provision of this Security Agreement (or the application of it) is held by a court to be invalid or unenforceable under applicable law, that provision will be deemed separable from the remaining provisions of this Security Agreement and will not affect the validity or interpretation of the other provisions of this Security Agreement or the application of that provision to a person or circumstance to which it is valid and enforceable.

**(Signature page immediately follows)**

10

**IN WITNESS WHEREOF**, the Parties have caused this Security Agreement to be executed by their respective duly authorized officers, as of the date first above-written.

**"BORROWER"**:

Unity Courier Service, Inc.
a California corporation

By: _____

Name: _____ALi SHARiF._____

Title: _____CEO_____

By: _____

Name: _____LARRY LUM_____

Title: _____

11

## Exhibit A

## DESCRIPTION OF COLLATERAL

All current and future assets of Obligor including but not limited to the following:

**Equipment:** All equipment means all goods, machinery, furniture, furnishings, fixtures, tools, supplies, motor vehicles and all other property used or useful in the business of Obligor, now or hereafter owned or possessed or hereafter acquired by Obligor, and including specifically (without limitation) all accessions thereto, all substitutions and replacements thereof, and all deposits made on any such equipment;

**Deposit Accounts and Other Cash:** All deposits and deposit accounts with any bank, savings and loan association, credit union or like organization, and all funds and amounts therein, and whether or not held in trust, or in custody or safekeeping, or otherwise restricted or designated for a particular purpose, and all other cash or marketable securities on hand, whether held in-vault or otherwise;

**Receivables:** Each and every right of Obligor to the payment of money, whether such right to payment now exists or hereafter arises, whether such right to payment arises out of a sale, lease or other disposition of goods or other property, out of a rendering of services, or of a loan, out of the overpayment of taxes or other liabilities, or any other transaction or event, whether such right to payment is created, generated or earned by Obligor or by some other person who subsequently transfers his, her or its interest to Obligor, whether such right to payment is or is not already earned by performance, and howsoever such right to payment may be evidenced, together with all other rights and interests (including all liens and other security interests) which Obligor may at any time have by law or agreement against any account debtor or other person obligated to make such payment or against any property of such account debtor or other persons including, but not limited to, all present and future accounts, contract rights, chattel paper, bonds, notes and other debt instruments, and rights to payment in the nature of general intangibles;

**General Intangibles:** All general intangibles of Obligor whether now owned or hereafter acquired, including (without limitation) all general intangibles (as defined in the UCC); and

**Securities:** All securities, joint venture and other equity interests now owned or hereafter acquired by Obligor.

The collateral shall include (i) all substitutes and replacements for and proceeds of any and all of the foregoing property, and in the case of all tangible collateral, all accessions, accessories, attachments, parts, equipment and repairs now or hereafter attached or affixed to or use in connection with any such goods and (ii) all warehouse receipts, bills of lading and other documents of titles now or hereafter covering such goods.

12

EXHIBIT 4

## COMMISSION AGREEMENT

This Commission Agreement (including all schedules and exhibits attached hereto, the "*Agreement*"), is made and effective as of March 21, 2013 (the "*Effective Date*"), by and among Expedited Packages LLC, a Nevada limited liability company ("*ExPak*"), Logistic Optical Management Inc., a Nevada corporation ("*Logistic Optical*"), Logistic Dental Management Inc., a Nevada corporation ("*Logistic Dental*") (each of ExPak, Logistic Optical, and Logistic Dental a "*Seller*" and collectively, the "*Transferors*"), Camco Resources LLC, a Nevada limited liability company ("*Camco*"), Unity Courier Service, Inc., a California corporation ("*Unity*" or "*Transferee*"), Ali Sharifi, an individual and fifty percent shareholder in Unity ("*Sharifi*"), and Larry Lum, an individual and fifty percent shareholder in Unity ("*Lum*") (Sharifi and Lum each a "*Guarantor*" and collectively, the "*Guarantors*"). Each of ExPak, Logistic Optical, Logistic Dental, Camco, Unity, Sharifi, and Lum are a "*Party*" to this Agreement, and collectively the "*Parties*."

### RECITALS

WHEREAS, Transferors' primary operational business is engaged in offering shipping and delivery services to doctors, medical professionals, opticians, laboratories, pharmaceutical companies, and their related suppliers and agents (the "*Business*"); and

WHEREAS, Transferors desire to transfer to Transferee, and Transferee desires to assume from Transferors by the payment of an ongoing royalty for the time period set forth herein, certain Business assets and relationships, all in the manner and subject to the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the representations, warranties, covenants and agreements herein contained, the Parties hereby agree as follows:

1.    Terms of Transfer.

    1.1    **Transfer of Assets.**  Subject to the terms and conditions of this Agreement, on the Closing Date (as defined herein), Transferors shall sell, transfer, convey, assign and deliver ("*Transfer*") to Transferee, and Transferee shall purchase, acquire and accept from Seller, all of Transferors' designated rights, contract rights, and operations of every kind, character and description, whether tangible or intangible, real, personal or mixed, accrued, contingent or otherwise, which are a part of, related to, and/or connected with certain present operations of the Business, less and except the Excluded Assets (as defined in Section 1.2 below) (after giving effect to the exclusion of the Excluded Assets, such assets are hereinafter collectively referred to as the "*Transferred Assets*") free and clear of all liens, claims and encumbrances of any nature whatsoever), designated as follows:

        (a)    All customer contracts, customer relationships, customer lists, customer names, and goodwill associated thereto of the optical-related customers currently being serviced from California as itemized on Schedule 1 attached hereto, including such customers' respective successors and permitted assigns (the "*Expedited Optical Customers*"); and

        (b)    Certain additional customer contracts, customer relationships, customer lists, customer names, and goodwill associated thereto currently being serviced from California as itemized on Schedule 2 attached hereto, including such customers' respective successors and permitted assigns

CONFIDENTIAL

(the "*Expedited Other Customers*") (the Expedited Optical Customers and the Expedited Other Customers collectively, the "*Customer Assets*").

1.2    Excluded Assets.  Any and all receivables attributable to the Customer Assets which are due to Transferors as of April 1, 2013 (the "*Excluded Assets*") shall remain the property of Transferors, even if the subject Expedited Optical Customers and/or Expedited Other Customers have not paid such obligations to Transferors as of such date.

1.3    Excluded Liabilities.  "*Excluded Liabilities*" shall mean, and Transferee shall not assume and shall have no liability for, any liabilities or obligations of Transferors arising from or relating to the Transferred Assets prior to the Closing Date to the extent not specifically set forth herein.  Transferors shall remain fully liable for, and shall promptly pay when due, the Excluded Liabilities.

1.4    Consideration.

(a)    Commission Royalty Payments.  In consideration for obtaining the right to acquire and service the Customer Assets, Transferee shall pay Transferors the Commissions (as herein defined) in monthly installments pursuant to the commission payments outlined in Section 1.4(b) hereunder (each total Commission payment a "*Royalty Payment*" and collectively, the "*Royalty Payments*"), commencing with the next complete month following the Closing Date.

(1)    Timing; Payment Period.  Each Royalty Payment shall be made by wire transfer of immediately available funds from Transferee to Transferors to an account of Camco as designated in writing by Transferors and Camco.  Transferee shall pay each Royalty Payment to Transferors no later than twenty (20) days after the end of each calendar month.  Such Royalty Payments shall continue for the "*Royalty Payment Period*" which is the earlier of: (i) ten years (i.e., one hundred and twenty (120) monthly payments) or (ii) at such time when the aggregate Royalty Payments made by Transferee to Transferors equal $3,000,000.00 (the "*Royalty Ceiling*").

(2)    Late Payments.  In the event Transferee does not timely pay any Royalty Payment, or any portion thereof, any late amount shall be subject to a late fee of two percent (2%) compounded monthly or for any portion thereof, until such deficiency is paid by Transferee in full.

(3)    Right of Prepayment.  At any time throughout the Royalty Payment Period, Transferee in its sole discretion may elect to pay Transferors the entire then-remaining Royalty Balance (as herein defined) in one payment (the "*Lump Sum Royalty Balance Payment*").  Upon receipt of such Lump Sum Royalty Balance Payment, Transferee's payment obligations under this Agreement shall be satisfied, and no later than five (5) business days thereafter Transferors shall release the Collateral referenced in Section 1.7 hereunder.

(b)    Commissions.

(1)    Calculation.  Of the Royalty Payment amounts for the Customer Assets payable by Transferee hereunder, Transferee will pay Transferors in monthly payments consisting of a percentage of revenue billed, net of any bona-fide credits or bad debts incurred as a calculation of revenue, to each of the Expedited Optical Customers, Expedited Other Customers, and Unity Optical Customers (as herein defined), calculated as follows:  The "*Optical Commission*" means five percent

(5%) of gross revenue billed to each of: (A) the Expedited Optical Customers and (B) any of Unity's optical-related customers whether or not in existence before or after the date hereof including any successors or assigns of such customers (the "*Unity Optical Customers*"). For the avoidance of doubt, a Unity Optical Customer shall include any customer in the optical industry, including doctors, laboratories, related suppliers and/or their related intermediaries or agents. The "*Non-Optical Commission*" means two percent (2%) of gross revenue billed to the Expedited Other Customers.

(2)     Monthly Minimum Payment.  The "*Commission*" means the sum of the Optical Commission and Non-Optical Commission each month.  In no event shall a monthly Commission payment be less than twelve thousand five hundred dollars ($12,500.00), irrespective of the gross revenue generated by the Expedited Customers, Unity Optical Customers, and Expedited Other Customers for any month.

(3)     Statements.  In conjunction with each Royalty Payment, no later than 20 days following the conclusion of each month Transferee shall send Transferors and Camco a detailed itemized statement of all monthly gross revenue attributable to each of the Expedited Optical Customers, Expedited Other Customers, and Unity Optical Customers, and the corresponding Commissions due and payable in connection therewith.  On such statement, Transferee shall also include a summary calculation of the Royalty Payments remaining to date, calculated as the Royalty Ceiling less the aggregate Royalty Payments paid (the "*Royalty Balance*").

(c)     Designee.  The Transferors hereby designate Camco to be the authorized recipient of any and all payments due to Transferors hereunder.  Without limiting any of their other rights hereunder, the Transferors hereby unequivocally assign to Camco all of Transferors' rights, title and interest in and to the First Payment and Royalty Payments, and Camco hereby accepts such assignment.

**1.5     Closing Date**.  The closing of the transactions contemplated by this Agreement (the "*Closing*") shall take place upon the confirmed receipt of the signature page of this Agreement by each party hereto, on a mutually agreeable date prior to April 1, 2013 and at such time as shall be agreed upon by the Parties (the "*Closing Date*").

**1.6     Audit Rights.**  Transferors and Camco shall have the right at any time upon prior reasonable notice and during regular business hours to inspect and examine the books and records of Transferee in connection with this Agreement.  Any such inspection or examination shall be scheduled at such time and conducted in such manner as to minimize disruption to Transferee's normal operations.  During such inspections and audits, Transferors and Camco shall have the right to make and take copies of Transferee's records as they deem necessary.  Transferee shall keep, maintain and preserve (in Transferee's principal place of business) complete and accurate financial records including, without limitation, purchase orders, sales records, invoices, receipts, correspondence, accounting, banking and financial and other records pertaining to this Agreement until the earlier of: (i) such date that all Royalty Payments hereunder are paid by Transferee in full and the Parties shall have executed a mutual release concerning further obligations hereunder, or (ii) ten (10) years following the Closing Date of this Agreement.  The exercise by Transferors and/or Camco in whole or in part, at any time, of the right to audit records and accounts or of any other right herein granted, or the acceptance by Seller

and/or Camco of any statement or statements shall be without prejudice to any rights or remedies of Transferors and Camco, and such acceptance, receipt and/or deposit shall not preclude or prevent Transferors or Camco from thereafter disputing the accuracy of any such statement. If pursuant to its audit right hereunder Transferors or Camco causes an audit and inspection to be instituted which thereafter reveals a deficiency between the amount rightfully to be paid to Transferors for any Royalty Payment(s) and the amount previously paid by Transferee to Transferors, then Transferee, upon Transferors' or Camco's prompt written demand, shall promptly repay such deficiency, and if the deficiency is more than 2% of the amount rightfully due to Transferors, Transferee shall pay the costs and expenses of such audit and inspection, including attorney's fees. The foregoing remedies are in addition to any other remedies which Transferors or Camco may have at law or in equity. Any and all records obtained by Transferors and Camco pursuant to an audit under this Section 1.6, and the results of such audit, are considered Confidential Information as defined in this Agreement, and may only be used for Transferors' and Camco's purposes as expressly authorized herein, or in connection with any action to recover any unpaid amounts by Transferee.

   1.7   Guarantors; Security.

   (a)   Guarantors. To ensure payment of the entire purchase price by Transferee to Transferors, Sharifi and Lum each hereby personally guarantee the payment of any and all Royalty Payment(s) by the execution of the personal guaranty attached as Exhibit A hereto.

   (b)   Security. As security for the repayment of all Royalty Payments by Transferee pursuant to this Agreement and the performance of all of Transferee's obligations hereunder, and in the event the personal guarantees executed by each of Sharifi and Lum as provided in Section 1.7(a) hereof are insufficient to satisfy any default by Transferee, Sharifi and Lum each jointly and severally grant Transferors and Camco a first priority perfected and enforceable security interest in each of the following parcels of real property located in Los Angeles County, California and all buildings, structures, houses, or other improvements contained thereon, and all proceeds thereof or any value received in exchange for any of the foregoing: (i) 3225 Fletcher Drive, Los Angeles, CA 90065 (Assessor's Parcel Number 5458 017 035), which is owned by 614 Garfield LLC, a California limited liability company whose sole members are Sharifi and Lum ("*Fletcher*"); (ii) 3838 Eagle Rock Boulevard, Los Angeles. CA 90065 (Los Angeles County Assessor's Parcel Number 5460 002 002), which is owned by 3838 Eagle Rock LLC, a California limited liability company whose sole members are Sharifi and Lum ("*Eagle Rock*"); and (iii) the properties immediately adjacent to Eagle Rock (noted by Los Angeles County Assessor's Parcel Numbers 5460 002 001 and 5460 002 003), which are owned by 3838 Eagle Rock LLC, a California limited liability company whose sole members are Sharifi and Lum (collectively, the "*Eagle Rock Neighbors*") (Fletcher, Eagle Rock, and Eagle Rock Neighbors collectively, the "*Collateral*"). Clean title reports and/or deeds of trust ("*Instruments of Conveyance*") for each of Fletcher, Eagle Rock, and the Eagle Rock Neighbors are attached as Exhibit B hereto. With such security interest in the Collateral, Transferors shall be entitled to foreclose on any or all of the subject properties in the event of a default by Transferee where the guarantees of each of Sharifi and Lum are insufficient to rectify any default.

   (1)   Further Actions. Sharifi and Lum shall jointly and severally take such actions as Transferors reasonably request from time to time to perfect or continue the first priority

security interest granted hereunder including, without limitation, filing UCC-1 financing statements in connection therewith. Sharifi and Lum will at all times defend Transferors and the Collateral against all claims of others.

(2)    No encumbrances. Sharifi and Lum shall not dispose of or encumber all or any substantial part of the Collateral without prior written consent of Transferors.

(3)    Partial Release by Transferors upon Receipt of Royalty Threshold. In the event the aggregate monthly Royalty Payments received by Transferors hereunder amount to one million five hundred thousand dollars ($1,500,000.00) and Transferee has made less than 120 Royalty Payments, Seller shall release one of the Collateral properties as security hereunder so long as the remainder Collateral properties have a fair market value of $1,500,000.00 as determined by Transferors in their reasonable discretion.

(4)    Complete Release by Transferors upon Receipt of Final Royalty Payment. Transferors hereby agree to take and shall take the steps necessary to terminate all of the UCC-1 financing statements filed in connection with this Agreement upon the full and complete payment by Transferee to Transferors of all amounts due under this Agreement.

2.    Representations and Warranties.

2.1    Mutual Representations and Warranties. Each Party represents and warrants to each other Party that, as of the date hereof: (i) it has full power and authority to execute and deliver this Agreement; (ii) this Agreement has been duly authorized and executed by such Party; (iii) this Agreement is a legally valid and binding obligation of such Party; and (iv) its execution, delivery and/or performance of this Agreement does not conflict with any agreement, understanding or document to which it is a party.

2.2    Representations and Warranties of Sharifi. Sharifi hereby represents and warrants that Sharifi currently has, and shall maintain throughout the Term of the Agreement, sufficient cumulative personal assets (including but not limited to cash, cash equivalents, stocks, bonds, assets, real property, personal property, and intangibles) to pay Transferors the entire amount of the Royalty Balance as it shall exist from time to time hereunder in the event that Transferee is unable or fails to pay Transferors for any reason.

2.3    Representations and Warranties of Lum. Lum hereby represents and warrants that Lum currently has, and shall maintain throughout the Term of the Agreement, sufficient cumulative personal assets (including but not limited to cash, cash equivalents, stocks, bonds, assets, real property, personal property, and intangibles) to pay Transferors the entire amount of the Royalty Balance as it shall exist from time to time hereunder in the event that Transferee is unable or fails to pay Transferors for any reason.

2.4    Representations and Warranties of Guarantors. The Guarantors hereby represent and warrant that: (i) they are now, and will throughout the Term of this Agreement be, the sole owners of all the Collateral, either personally or through entities where no other party other than the Guarantors has an interest of any kind; (ii) the Collateral now is and throughout the Term of this Agreement will remain

free and clear of any and all liens, charges, security interests, encumbrances and adverse claims; and (iii) the deeds / instruments of conveyance for the Collateral attached as Exhibit A hereto evidencing Guarantors' ownership are true and correct.

3.      **Conditions to Closing.**  The obligation of Transferors and Transferee to close under this Agreement is not subject to the satisfaction of any conditions.  Subsequent to the execution of this Agreement, in the event Transferors or Transferee do not fulfill any of their obligations hereunder prior to Closing, Transferors or Transferee as applicable shall have the right to fully enforce the terms of this Agreement.

4.      **Taxes**.

4.1      **Transfer Taxes.**  The party hereto that is responsible under applicable law shall bear and pay in their entirety all taxes and registration and transfer fees, if any, payable by reason of the Transfer of the Transferred Assets pursuant to this Agreement.  Each party hereto will cooperate to the extent practicable in minimizing all taxes (other than income taxes) and fees levied by reason of the Transfer of the Transferred Assets.

4.2      **Other Taxes.**  Each party shall have full responsibility for applicable withholding taxes for all compensation paid under this Agreement, and for compliance with all applicable labor and employment requirements with respect to their business organization, including state worker's compensation insurance coverage requirements and any U.S. immigration visa requirements.

5.      **Term.**  The term of this Agreement shall commence upon the Effective Date and expires upon the payment of the final Royalty Payment during the Royalty Payment Period by Transferee, unless Transferee elects to make a Lump Sum Royalty Balance Payment as provided herein.

6.      **Indemnification.**

6.1      **Transferors' Indemnity.**

(a)      Transferors agree to indemnify and hold harmless Transferee and its officers, directors, employees, and agents (collectively, "***Covered Transferee Parties***") from and against any and all third party claims and causes of action, as well as related losses, liabilities, judgments, awards, settlements, damages, expenses and costs (including reasonable attorney's fees and related court costs and expenses) (collectively, "***Damages***") incurred or suffered by Covered Transferee Parties, which directly relate to or directly arise out of liabilities in connection with the Customer Assets which occurred or existed prior to the Closing Date.

(b)      Transferors agree to indemnify and hold harmless Camco and its officers, directors, employees, and agents (collectively, "***Covered Camco Parties***") from and against any and all third party claims and causes of action, as well as Damages incurred or suffered by Covered Camco Parties, which directly relate to or directly arise out of liabilities in connection with the Customer Assets which occurred or existed prior to the Closing Date, or any of Transferors' obligations hereunder.

6.2      **Transferee's Indemnity.**

(a)      Transferee agrees to indemnify and hold harmless each Transferor, and the respective officers, directors, employees, and agents of each (collectively, *"Covered Transferor Parties"*) from and against any and all third party claims and causes of action, as well as Damages incurred or suffered by Covered Transferor Parties, which directly relate to or directly arise out of liabilities in connection with the Customer Assets which occur subsequent to the Closing Date, or any of Transferee's obligations hereunder.

(b)      Transferee agrees to indemnify and hold harmless the Covered Camco Parties from and against any and all third party claims and causes of action, as well as Damages incurred or suffered by Covered Camco Parties, which directly relate to or directly arise out of liabilities in connection with the Customer Assets which occur subsequent to the Closing Date, or any of Transferee's obligations hereunder.

6.3     **Requirements for Obtaining Indemnification.**   To obtain indemnification, the party seeking indemnification (*"Indemnitee"*) must: (i) give written notice of any claim promptly to the other party (*"Indemnitor"*); (ii) give Indemnitor, at its option, sole control of the defense and settlement of such claim, provided that Indemnitor may not, without the prior consent of Indemnitee (not to be unreasonably withheld), settle any claim unless it unconditionally releases the Indemnitee of all liability; (iii) provide to Indemnitor all available information and assistance; and (iv) not compromise or settle such claim.

## 7.   Confidentiality.

7.1     **Confidential Information.**   *"Confidential Information"* means non-public information of a Party disclosed by such Party to another Party hereto, either directly or indirectly, in writing, orally or by inspection of tangible objects or records, or to which the other party may have access, including, but not limited to, business plans, customer data, customer lists, customer names, design documents, drawings, engineering information, financial analysis, forecasts, formulas, hardware configuration information, know-how, ideas, inventions, market information, marketing plans, processes, products, product plans, research, specifications, software, source code, trade secrets, the terms of this Agreement or any other information which a reasonable person would consider confidential and/or which is marked "confidential" or "proprietary" or some similar designation by the disclosing party or which is of a confidential nature even though not specifically so designated.

7.2     **Exclusions.**   Confidential Information shall not, however, include any information which the recipient can establish: (i) was or has become generally known or available or a part of the public domain without direct or indirect fault, action, or omission of the recipient; (ii) was known by the recipient prior to the time of disclosure, according to the recipient's prior written documentation; (iii) was received by the recipient from a source other than the discloser, rightfully having possession of and the right to disclose such information; or (iv) was independently developed by the recipient, where such independent development has been documented by the recipient.

7.3     **Obligations; Disclosure.**

(a)      Mutual Obligations.   Each of the parties and their agents agree: (i) not to disclose any Confidential Information to any third parties except as mandated by law; (ii) not to use any

Confidential Information for any purposes except carrying out such party's rights and responsibilities under this Agreement; and (iii) to keep the Confidential Information confidential using the same degree of care such party uses to protect its own confidential information; provided, however, that such party shall use at least reasonable care.  These obligations shall survive the termination of this Agreement.

(b)    Transferee's Additional Obligations.  From the date hereof until the Closing Date, Transferee further agrees not to disclose the existence of this Agreement or any of its terms to any of Transferors' employees, contractors or agents without Transferors' prior written consent.

7.4    Remedies.  If any Party breaches any of its obligations with respect to confidentiality or the unauthorized use of Confidential Information hereunder, the non-breaching Party or Parties shall be entitled to seek equitable relief to protect its interest therein, including but not limited to, injunctive relief, as well as money damages.

8.    Further Acts and Assurances; Additional Transactions.

8.1    Further Acts and Assurances.  The Parties agree to use commercially reasonable efforts to promptly execute and deliver such further instruments and do or cause to be done such further acts as may be reasonably necessary to carry out the intent and purposes of this Agreement.

8.2    Information Technology.  The Parties agree to engage in subsequent discussions in good faith concerning Transferee's utilization of Transferors' proprietary information technology ("IT") solution in Transferee's operations, with Transferee to be responsible for all ongoing costs in the event of such IT integration.

8.3    Assurances Regarding Employees and Contractors.  Upon prior written notice from Transferee to Transferors, the Transferors agree to use commercially reasonable efforts to take, or cause to be taken, all actions to assist Transferee in the hiring of Transferors' employees and contractors sought to be hired by Transferee on an as-needed basis; provided, however, that Transferee is responsible for any payment obligations in connection with such employment.

8.4    Assurances Regarding Facilities.  In connection with Section 8.3 hereof, Transferors agrees to use commercially reasonable efforts to take, or cause to be taken, all actions to assist Transferee in utilizing Transferors' affiliated ground company facilities, trucks, or equipment upon reasonable notice; provided, however, that Transferee shall pay for such services at Transferors' cost according to a statement of work executed between the Parties.

9.    Miscellaneous.

9.1    Counterparts.  This Agreement may be executed in any number of counterparts and in facsimile or electronically, each of which shall be an original but all of which together shall constitute one and the same instrument.

9.2    Notices.  All notices, requests, demands and other communications that are required or may be given pursuant to the terms of this Agreement shall be in writing and shall be deemed duly given when delivered by hand, by overnight courier, by electronic mail (email), or posted in the United States mail by registered or certified mail with postage pre-paid, return receipt requested, to the addresses listed as follows or to such other address as may hereafter be furnished in writing by either party hereto

to the other party. Such notice shall be deemed to have been given as of the date it is delivered, if by personal delivery; the next business day, if deposited with an overnight courier; as of the date it is delivered, if by email; and five days after being sent by registered or certified mail. Notices shall be sent to each Party at the address indicated on the signature page to this Agreement, as may be updated in writing by a duly authorized representative of such Party.

9.3    **Amendments**. This Agreement may be amended or modified at any time, but only by a written instrument executed by all of the parties hereto.

9.4    **Entire Agreement**. This Agreement (together with the other agreements, certificates, instruments and documents delivered pursuant hereto and the schedules and exhibits attached hereto) constitutes the entire agreement among the parties hereto with respect to the subject matter hereof, and supersedes all prior term sheets, agreements and understandings, oral and written, among the parties hereto with respect to the subject matter hereof.

9.5    **Applicable Law; Jurisdiction**. This Agreement shall be governed by and construed in accordance with the internal laws of the State of California, without regard to conflict of laws principles. The parties agree that any suit, action, or proceeding arising out of, or with respect to, this Agreement or any judgment entered by any court in respect thereof shall be brought exclusively in the state and federal courts of the state of California located in the County of Los Angeles and each of ExPak, Logistic Optical, Logistic Dental, Camco, Unity, Sharifi, and Lum hereby irrevocably accepts the exclusive personal jurisdiction and venue of those courts for the purpose of any suit, action or proceeding. Each Party irrevocably waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly relating to this Agreement or the transactions contemplated herein. Each of ExPak, Logistic Optical, Logistic Dental, Camco, Unity, Sharifi, and Lum further agree that service of process by either overnight courier or certified mail, return receipt requested, shall constitute personal service for all purposes hereof.

9.6    **Headings**. The headings contained herein are for the sole purpose of convenience of reference, and shall not in any way limit or affect the meaning or interpretation of any of the terms or provisions of this Agreement.

9.7    **Assignment; Binding Effect; Benefits**. This Agreement may not be assigned by Transferee without the prior written consent of the Transferors. This Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their respective heirs, legal representatives, successors and permitted assigns. Except as provided herein, nothing in this Agreement, express or implied, is intended to confer upon any person other than the parties hereto and their respective heirs, legal representatives, successors and permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

9.8    **Severability**. If any provision of this Agreement is held by a court or arbitrator of competent jurisdiction to be contrary to law, such provision shall be changed by the court or by the arbitrator and interpreted so as to best accomplish the objectives of the original provision to the fullest extent allowed by law, and the remaining provisions of this Agreement shall remain in full force and effect.

9.9      <u>No Waiver</u>.  No failure or delay on the part of either party in exercising any right, power or remedy under this Agreement shall operate as a waiver, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise or the exercise of any other right, power or remedy.

9.10     <u>Non-Solicitation</u>.  Provided that Transferee fulfills all of its payment obligations hereunder and at no time is in default of such obligations, for the duration of this Agreement and for a two-year period from the date of the termination of this Agreement (the "*Non-Solicitation Period*"), Transferors shall not: (i) solicit for employment or engagement, directly or indirectly through any other entity, any then current employee of Transferee, other than by means of a general advertising campaign open to all comers and not specifically targeted at any staff of Transferee; or (ii) solicit for employment or engagement, directly or indirectly through any other entity, any Customer Assets.  Notwithstanding the foregoing, the Parties hereto expressly agree that nothing herein shall restrict Transferors' ability to operate their currently existing affiliate businesses (including First Legal and Accurate Courier) during the Non-Solicitation Period, provided such businesses do not solicit the Customer Assets.  If any party breaches any of its obligations in this section, the non-breaching party shall be entitled to seek equitable relief to protect its interest therein, including but not limited to, injunctive relief, as well as money damages.

9.11     <u>Survival</u>.  Sections of this Agreement intended by their nature and content to survive termination of the Agreement shall so survive.

[The remainder of this page intentionally left blank.  Signature pages follow.]

CONFIDENTIAL

IN WITNESS WHEREOF, the Parties have executed this Asset Purchase Agreement as of the Effective Date.

THE TRANSFERORS:

EXPEDITED PACKAGES LLC
15335 Morrison Street, Suite 202
Sherman Oaks, CA 91403

By:_____

Name: _ELISA GILBOA_

Title: _O-M_

LOGISTIC OPTICAL MANAGEMENT INC.
15335 Morrison Street, Suite 202
Sherman Oaks, CA 91403

By:_____

Name: _ELISA GILBOA_

Title: _O-M_

LOGISTIC DENTAL MANAGEMENT INC.
15335 Morrison Street, Suite 202
Sherman Oaks, CA 91403

By:_____

Name: _ELISA GILBOA_

Title: _O-M_

CAMCO (TRANSFERORS' DESIGNEE):

CAMCO RESOURCES LLC
871 Coronado Center Drive, Suite 200
Henderson, NV 89052

By:_____

Name: _Bruce Epstein_

Title: _Operations Manager_

TRANSFEREE:

UNITY COURIER SERVICE, INC.
3231 Fletcher Drive
Los Angeles, CA 90065

By:_____

Name: _ALI SHARIFI_

Title: _CEO_

GUARANTOR:

ALI SHARIFI
3231 Fletcher Drive
Los Angeles, CA 90065

By:_____

Name: _ALI SHARIFI_

GUARANTOR:

LARRY LUM
1040 W. Orange Grove Avenue
Arcadia, CA 91006

By:_____

Name: _LARRY LUM_

<u>EXHIBIT A</u>

### PERSONAL GUARANTY

Reference is hereby made to that certain Commission Agreement effective March 21, 2013 (the "Commission Agreement"), by and among the Transferors, Camco, Transferee, Sharifi, and Lum. Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Commission Agreement.  The Commission Agreement is incorporated by reference herein

The execution of this Guaranty Agreement (the "***Guaranty Agreement***") by the undersigned Guarantor is an express condition to the consummation of the transactions contemplated by the Commission Agreement and the Transferors are unwilling to enter into or perform in accordance with the Commission Agreement in the absence of the execution of this Guaranty Agreement.

Guarantor, on behalf of Transferee, hereby personally guarantees the payment of any obligations of Transferee, including the entire Purchase Price, under the Commission Agreement.  Guarantor agrees to bind himself to pay Camco, as Transferors' designee, on demand any sum which may become due to Transferors by Transferee under the Commission Agreement whenever Transferee shall fail to pay the same.  It is understood that this guaranty shall be a continuing and irrevocable guaranty, and indemnity for such payment obligations of Transferee under the Commission Agreement.  Guarantor hereby waives notice of default, non-payment and notice thereof and consents to any modification or renewal of the Commission Agreement hereby guaranteed.  Any right to set-off exercised by Transferors shall be deemed to have been exercised immediately on the occurrence of a default by Transferee, even though such set-off is made or entered on the books of Transferors at any subsequent time.  Guarantor further agrees to pay all costs and expenses including, without limitation, all court costs and reasonable attorneys' fees and expenses paid or incurred by Transferors and Camco in endeavoring to collect all or any part of the Royalty Payments from, or in prosecuting any action against, Transferee or the Guarantor.

This Guaranty Agreement embodies the complete agreement and understanding among the parties and supersedes and preempts any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.  This Guaranty Agreement may be executed in separate counterparts, each of which is deemed to be an original and all of which taken together constitute one and the same agreement.  Any provision of this personal guarantee which is prohibited or unenforceable under applicable law shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof.  This personal guarantee shall be governed by the internal laws of the State of California, without regard to conflicts of laws principles, and any disputes hereunder shall be in accordance with the jurisdiction provisions of the Commission Agreement.  If this Guaranty Agreement shall differ or conflict in terms with any terms of the Commission Agreement, the terms of the Commission Agreement shall prevail.

Guarantor assumes responsibility for keeping himself informed of the financial condition of the Transferee and of all other circumstances bearing upon the risk of Transferee's default. Transferors shall have no duty to advise Guarantor of information known to Transferors regarding such condition or circumstances.  No delay on the part of Transferors in the exercise of any right or remedy shall operate

iii

as a waiver or constitute a discharge any of Guarantor's obligations under this Guaranty Agreement, and no single or partial exercise by Transferors of any right or remedy shall preclude the further exercise to any extent.

IN WITNESS WHEREOF, the parties have caused this personal guarantee to be executed as of the date set forth below.

GUARANTOR

Date:   March __21__, 2013

By:     _____

Name:   _____

Title:  _____CEO_____

ACKNOWLEDGED AND AGREED:

TRANSFERORS' DESIGNEEE

CAMCO RESOURCES, LLC

By:     _____

Name:   ____Bruce Epstein____

Title:  ____Operations Manager____

## EXHIBIT B

COLLATERAL INSTRUMENTS OF CONVEYANCE

v

EXHIBIT 5

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Corporation Service Company
800-858-5294

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**
CORPORATION SERVICE COMPANY
801 ADLAI STEVENSON DRIVE
SPRINGFIELD, IL 62703
USA

DOCUMENT NUMBER: 52994710002
FILING NUMBER: 16-7505715300
FILING DATE: 01/21/2016 14:31

IMAGE GENERATED ELECTRONICALLY FOR XML FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only <u>one</u> Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Unity Courier Service, Inc. | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 3231 Fletcher Dr | Los Angeles | CA | 90065 | USA |

**2. DEBTOR'S NAME:** Provide only <u>one</u> Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only <u>one</u> Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Camco Resources, LLC | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 871 Coronado Center Drive, Ste 200 | Henderson | NV | 89052 | USA |

**4. COLLATERAL:** This financing statement covers the following collateral:
All properties, assets and rights of Debtor, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof.

5. Check <u>only</u> if applicable and check <u>only</u> one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions)    ☐ being administered by a Decedent's Personal Representative

6a. Check <u>only</u> if applicable and check <u>only</u> one box:
☐ Public-Finance Transaction    ☐ Manufactured-Home Transaction    ☐ A Debtor is a Transmitting Utility

6b. Check <u>only</u> if applicable and check <u>only</u> one box:
☐ Agricultural Lien    ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):    ☐ Lessee/Lessor    ☐ Consignee/Consignor    ☐ Seller/Buyer    ☐ Bailee/Bailor    ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
110837220

**FILING OFFICE COPY**

EXHIBIT 6

## PROMISSORY NOTE

**Dated as of February 12, 2016**

**$200,000.00**                                                    **Los Angeles, California**

      FOR VALUE RECEIVED, the undersigned ("Maker") promises to pay on or before February 11, 2017, to STEVE KELLEY LOPEZ ("Holder"), or order, at 14602 Fair Oak Drive, Lake Elsinore, CA 92530 or such other place as the Holder may designate upon written notice to Maker, in lawful money of the United States, the principal sum of Two Hundred Thousand Dollars ($200,000.00), with interest thereon from February 12, 2016 computed on the unpaid principal at the rate of ten percent (10.0%) per annum, simple interest, payable in monthly installments of interest only or more on the first day of each month, commencing March 1, 2016. A balloon payment consisting of all accrued and unpaid interest and any unpaid principal due under this Note shall be paid on February 11, 2017; however, Maker may pre-pay this Note in whole or in part without incurring any pre-payment penalty. All payments made hereunder shall be applied first to interest then due and the remainder thereof, if any, shall be applied against the outstanding principal balance, and interest thereon shall thereupon cease upon the principal so credited. This Note is secured by a Security Agreement granting the Holder a security interest in all assets of the maker and a UCC-1 Financing Statement.

      If an attorney is employed to collect or otherwise enforce payment of this Note, all costs of collection, including reasonable attorneys' fees, whether or not suit is filed, shall be paid by Maker. Costs of collection include any attorneys' fees and expenses incurred by Holder in connection with any bankruptcy case affecting in any way its right to enforce this Note or the Security Agreement.

      The undersigned hereby waives demand, protest and notice of demand, protest and nonpayment, any and all other notices or demands in connection with the delivery, acceptance, performance, default or enforcement of this Note. The pleading of any statute of limitations as a defense to the obligations evidenced by this Note is waived to the fullest extent permissible by law, and Maker hereby consents to any extension of time, renewals, releases of any party to this Note, waivers or modifications that may be granted or consented to by Holder in respect to the time of payment or any other provisions of this Note.

      No delay or omission on the part of Holder to exercise any rights hereunder shall constitute a waiver of said right or any other right hereunder. The acceptance by Holder of payment hereunder that is less than payment in full of all amounts due and payable at the time of payment or at any subsequent time shall not constitute a waiver of Holder's right to collect the remaining balance of said payment.

      The Holder of this Note shall have the right to sell, assign or otherwise transfer, either in part or in its entirety, this Note and the Security Agreement without Maker's consent.

      This Note shall be governed by and construed in accordance with the laws of the State of California and is intended to be performed in accordance with such laws. If any provision of this Note shall be invalid or unenforceable, neither the remainder of this Note nor the application of such provision to any other person or circumstance shall be affected thereby, but rather same shall be enforced to the greatest extent permitted by law.

      This Note and all of the covenants, promises, and agreements contained in it shall be binding on and shall inure to the benefit of the respective legal and personal representatives, devisees, heirs, successors, and assigns of Maker and Holder.

      Time is of the essence for each and every obligation under this Note.

      **IN WITNESS WHEREOF**, this Promissory Note has been executed by the undersigned as of the date first above written.

**UNITY COURIER SERVICE, INC.**

By: _____

    LARRY LUM , **President**

EXHIBIT 7

## SECURITY AGREEMENT

This Security Agreement (the "Agreement") is entered into as of the 12th day of February, 20156 by and between UNITY COURIER SERVICE, INC., a California corporation ("Debtor") and STEVE KELLEY LOPEZ ("Secured Party"), and is based upon the following facts:

### RECITALS

A.    Debtor has requested that Secured Party lend Debtor the sum of $200,000. Debtor has further requested that Secured Party consider making additional loans to the Debtor in the future should Debtor request additional loans, but Secured Party has not promised to do so. As a condition for Secured Party's making of a $200,000 loan to the Debtor (the "$200,000 Loan") and to consider (but not promise) making additional loans in the future, Secured Party requires that the $200,000 Loan and all future indebtedness (collectively, the "Debts") of the Debtor to Secured Party be secured by Debtor's Collateral (as hereinafter defined).

B.    In connection with the $200,000 loan Secured Party has agreed to make to Debtor, the Debtor has agreed to execute a promissory note in the sum of $200,000 in favor of Secured Party all due and payable no later than February 11, 2017 (the "$200,000 Note"). All promissory notes issued or to be issued by Debtor to Secured Party are hereinafter collectively referred to as the "Notes."

C.    Debtor and Secured Party desire to enter into this Agreement in order to evidence the financing arrangements between Debtor and Secured Party. This Agreement, the Note and all other Notes, and all other documents executed in connection with the $200,000 Loan and all other Loans that Secured Party may, but is not obligated to, make to Debtor are collectively referred to as the "Loan Documents."

### AGREEMENT

1.    **SECURITY INTEREST**. To secure the "Obligation" (as defined below), Debtor hereby transfers, conveys, assigns, and grants to Secured Party a continuing security interest in all of Debtor's right, title and interest in all real, personal and other property, whether now or hereafter existing or acquired, regardless of where located, including, without limitation, the following (hereinafter, collectively, the "Collateral"):

(a)    Accounts, including Health-Care-Insurance Receivables;
(b)    Equipment;
(c)    Fixtures;
(d)    Certificated Securities;
(e)    Chattel Paper, including Electronic Chattel Paper;
(f)    Computer Hardware and Software and all rights with respect thereto, including, any and all licenses, options, warranties, service contracts, program services, test rights, maintenance rights, support rights, improvements rights, renewal rights and indemnifications, and any substitutions, replacements, additions or model conversions of any of the foregoing;
(g)    Commercial Tort Claims;
(h)    Deposit Accounts;
(I)    Documents;
(j)    Financial Assets;
(k)    General Intangibles;
(l)    Goods (including all of its Equipment, Fixtures and Inventory), and all embedded software, accessions, additions, attachments, improvements, substitutions and replacements thereto and therefor;
(m)    Instruments;
(n)    Intellectual Property;
(o)    Investment Property;
(p)    Letters of Credit Rights;

(q)    Money (of every jurisdiction whatsoever);
(r)    Security Entitlements;
(s)    Supporting Obligations;
(t)    Uncertificated Securities; and
(U)    to the extent not included in the foregoing, all other real, personal or other property of any kind or description; together with all books, records, writings, databases, information and other property relating to, used or useful in connection with, or evidencing, embodying, incorporating or referring to any of the foregoing, and all Proceeds, products, offspring, rents, issues, profits and returns of and from any of the foregoing.

2.    **OBLIGATION.** This security interest is given as security for all indebtedness and obligations (collectively "Obligations") including all loans, advances, debts, liabilities, obligations, lease payments, guarantees of obligations of others, covenants and duties owing by Debtor to Secured Party of every nature, kind and description (whether or not evidenced by this Agreement, the $200,000 Note, any other Notes, other instrument or any other agreement between Debtor and Secured Party and whether or not for the payment of money) direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising at any time, or by any means, including, without limitation, liabilities or obligations, all interest, fees, charges, expenses and attorneys' fees incurred by Secured Party in connection with Debtor.

3.    **PROCEEDS.** As used in this Security Agreement, the term "proceeds" means all products of the Collateral and all additions and accessions to, replacements of, insurance or condemnation proceeds of, and documents covering any of the Collateral, all property received wholly or partly in trade or exchange for any of the Collateral, all leases of any of the Collateral, and all rents, revenues, issues, profits, and proceeds arising from the sale, lease, license, encumbrance, collection, or any other temporary or permanent disposition, of any of the Collateral or any interest therein.

4.    **TITLE; FILING.** Debtor warrants that, except as previously disclosed in writing to Secured Party, it is the owner of the Collateral free and clear of all liens, claims, and encumbrances of whatever kind or nature. Debtor authorizes Secured Party to execute a financing statement to perfect Secured Party's interest in the Collateral, which Secured Party may immediately cause to be filed in its place of incorporation and in all jurisdictions in which Collateral exists. Debtor covenants that so long as any portion of the Obligation remains unpaid, Debtor shall not execute or file a financing statement or security agreement covering the Collateral to anyone other than Secured Party, except in the ordinary course of business or as otherwise allowed by Secured Party. In addition, Debtor agrees to sign and deliver one or more financing statements or supplements thereto or other instruments as Secured Party may from time to time require to comply with the Uniform Commercial Code or other applicable law to preserve, protect and enforce the security interest of Secured Party and to pay all costs of filing such statements or instruments.

5.    **CARE OF COLLATERAL.** Debtor shall keep in effect all licenses, permits and franchises required by law or contract relating to Debtor's business (if applicable), property, or the Collateral; maintain insurance on the Collateral; keep the Collateral in good repair and be responsible for any loss or damage to it; at all times warrant and defend Debtor's ownership and possession of the Collateral; keep the Collateral free from all liens, claims, encumbrances and security interests; pay when due all taxes, license fees, and other charges upon the Collateral or upon Debtor's business, property or the income therefrom; and not misuse, conceal or in any way use or dispose of the Collateral unlawfully or contrary to the provisions of this Security Agreement or of any insurance coverage. Loss of, damage to, or uncollectability of the Collateral or any part thereof shall not release Debtor from any of its obligations hereunder.

6.    **DEFAULT.** A default hereunder shall occur if any of the following events occur: (1) Debtor fails to pay any portion of the Obligation when due; (2) Debtor fails to perform any undertaking or materially breaches any warranty or covenant in any of the Loan Documents or in any other agreement between Secured Party and Debtor (the "Other Agreements"); (3) any statement, representation or warranty of Debtor made in the Loan Documents or any of the other Agreements

2

is untrue in any material respect when made; (4) Debtor becomes insolvent or unable to pay debts as they mature or makes an assignment for the benefit of creditors or any proceeding is instituted by or against it alleging that it is insolvent or unable to pay its debts as they mature; (5) dissolution of Debtor; (6) an attachment, garnishment, execution, levy or other process is issued or a lien filed against any property of Debtor, which is not removed within 60 days of such attachment, garnishment, levy, execution or lien filing and (7) Debtor transfers an interest in any of the Collateral contrary to the provisions of this Security Agreement without the prior written consent of Secured Party other than in the ordinary course of business. Waiver of any default shall not constitute a waiver of any other or subsequent default.

       **7.**    **REMEDIES.**  Upon the occurrence of any default hereunder and, at any time thereafter, all of the Obligation shall, at the election of Secured Party and without notice of such election, or demand for payment, become immediately due and payable and Secured Party shall have the remedies of a secured party under the California Commercial Code or other applicable law.  All rights and remedies herein provided are cumulative.

       **8.**    **ATTORNEYS' FEES AND COSTS.**  Debtor shall reimburse Secured Party for all attorneys' fees and expenses, filing fees and all other fees and expenses incurred in negotiating and preparing this Agreement, all other Loan Documents, and any of the Other Agreements and in protecting and enforcing Secured Party's rights under this Agreement, all other Loan Documents and any of the Other Agreements regardless of whether a lawsuit, arbitration or mediation proceeding is filed and including in any bankruptcy, assignment for benefit of creditors or other proceeding ("Secured Party's Fees and Costs").  Further, should an action be brought to interpret or enforce this Agreement, the Loan Documents and Other Agreements  the prevailing party shall be entitled to an award of its reasonable attorneys' fees and costs incurred in connection with such action.  As a further condition for Secured Party's making of the $200,000 Loan, Secured Party requires that Debtor deposit the sum of $5,000 into the Law Offices of Ira Benjamin Katz, A Professional Corporation's Client Trust Account (the ""CTA") to be applied towards payment of Secured Party's Fees and Costs.  Within three business days of a written request therefor by Secured Party, Debtor shall deposit such additional sums into the CTA as may be requested by Secured party to be applied towards payment of Secured Party's Fees and Costs.

       **9.**    **NOTICES.**  All notices or demands by either party to the other relating to this Agreement shall be in writing and shall be deemed given when personally delivered or when sent by first-class United States mail, postage prepaid, properly addressed to Debtor or Secured Party at the addresses stated in this Agreement or at such other addresses as they may from time to time specify in writing.

If to Debtor:

Unity Courier Service, Inc.
3231 Fletcher Drive
Los Angeles, CA 90065

With a copy to:

Alan F Broidy, Esq.
Law Offices Of Alan F Broidy, APC
1925 Century Park East. 17th Floor
Los Angeles, CA 90067
and via email: alan@broidylaw.com

If to Secured Party:

Steve Kelley Lopez
14602 Fair Oak Drive
Lake Elsinore, CA 92530

With a copy to:

Ira Benjamin Katz, Esq.
Law Offices of Ira Benjamin Katz, APC
1925 Century Park East. 17th Floor
Los Angeles, CA  90067
and via email: ikatz@katzlaw.net

3

10.    **MISCELLANEOUS PROVISIONS.**

(a) <u>Effect of Headings</u>. The subject headings of the paragraphs, subparagraphs and sections of this Agreement are included for purposes of reference only, and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or the construction or interpretation of any of its provisions.

(b) <u>Interpretation</u>. All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural, as the identity of the person or persons may require. The language in all parts of this Agreement shall be construed as a whole in accordance with its fair meaning, and without regard to California Civil Code 1654 or similar statutes.

(c) <u>Construction</u>. This Agreement shall not be construed in favor of or against any Party hereto, but shall be construed as if prepared by all Parties hereto.

(d) <u>No Implied Waiver</u>. The waiver by Secured Party of any breach of any provision of this Agreement, any other Loan Document or any of the Other Agreements or warranty or representation set forth in any of the aforesaid documents shall not be construed as a waiver of any subsequent breach. The failure to exercise any right hereunder by Secured Party shall not operate as a waiver of such night. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, whether or not similar; nor shall any waiver constitute a continuing waiver. No waiver shall be binding unless executed in writing by the Party making the waiver.

(e) <u>No Third Party Beneficiaries</u>. Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the Parties to it and their respective transferees, successors, and assigns; nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any Party to this Agreement, nor shall any provision give any third person any right of subrogation over or action against any Party to this Agreement.

(f) <u>Parties' Representations and Warranties</u>. Except as otherwise permitted by this Agreement, all representations and warranties by each of the Parties in this Agreement or in any written statement that shall be delivered to or by any of them under this Agreement shall be true on and as of the effective date as though made at that time.

(g) <u>Nature of Survival of Obligations</u>. No representations or warranties whatsoever are made by any Party, except as specifically set forth in this Agreement, or in an instrument, certificate, opinion, or other writing provided for in it. All statements contained in any of these instruments, certificates, opinions, or other writings shall be deemed to be representations and warranties under this Agreement. The representations, warranties, and indemnities made by the Parties in this Agreement, or in instruments, certificates, opinions, or other writings provided for in the covenants and agreements to be performed or complied with by the respective Parties under it, shall be deemed to be continuing and shall survive the execution and performance of this Agreement. Nothing in this paragraph shall affect the obligations and releases of the Parties with respect to covenants and agreements contained in this Agreement that are permitted to be performed, in whole or in part, after execution.

(h) <u>Severability</u>. Any provision hereof prohibited by or unlawful or unenforceable under any applicable law of any jurisdiction shall as to such jurisdiction be ineffective without affecting any other provision of this Agreement. To the full extent, however, that the provision of such applicable law may be waived, they are hereby waived to the end that this Agreement be deemed to be a valid and binding agreement enforceable in accordance with its terms.

4

(i) <u>Costs and Expenses</u>.  Except as expressly provided herein, each Party hereto shall bear his own costs and expenses incurred in connection with the making and execution of this Agreement, including, without limitation, attorneys' fees.

(j) <u>Further Assurances</u>.  Each of the Parties hereto shall do any and all things and execute any and all documents necessary to implement fully the intent and purposes of this Agreement.

(k) <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement among the Parties pertaining to the subject matters contained in it and supersedes all prior and contemporaneous agreements, representations, and understandings of the Parties.  No other agreements, oral or written, pertaining to the subject transaction have been made by any Party which are not embodied herein, and this Agreement contains all of the covenants and agreements between the Parties.  Each Party hereto acknowledges that no course of prior dealing between the Parties, no usage of trade, and no parol or extrinsic evidence of any nature shall be used to supplement, modify or vary any of the terms hereof; and that no representations, inducements, promises or agreements, orally or otherwise, and no other agreement, statement or promise not contained in this Agreement shall be valid or binding.

(l) <u>Amendment</u>. No supplement, modification, or amendment of this Agreement shall be binding unless executed in writing by all the Parties hereto.

(m) <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, and whenever signed shall be delivered and therefore executed at Los Angeles, California, and governed by California law.

(n) <u>Covenants and Conditions</u>.  Each provision of this Agreement performable by any Party hereto shall be deemed both a covenant and condition.

(o) <u>Governing Law.</u>  This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of California.

(p) <u>Successors and Assigns.</u> This Security Agreement binds Debtor, its successors and assigns, and inures to the benefit of Secured Party, its successors and assigns.

IN WITNESS WHEREOF, the parties have executed this Security Agreement as of the date first written above.

<u>DEBTOR</u>

UNITY COURIER SERVICE, INC.

By_____, President

<u>SECURED PARTY</u>

By_____
STEVE KELLEY LOPEZ

5

EXHIBIT 8

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS

| | |
|---|---|
| A. NAME & PHONE OF CONTACT AT FILER (optional)<br><br>3102828580 | |
| B. E-MAIL CONTACT AT FILER (optional) | |
| C. SEND ACKNOWLEDGMENT TO: (Name and Address)<br><br>Law Offices of Ira Benjamin Katz, A Professional Corporation<br>1925 Century Park East<br>Suite 1700<br>Los Angeles, CA 90067<br>USA | DOCUMENT NUMBER: 53434750003<br>FILING NUMBER: 16-7509634304<br>FILING DATE: 02/15/2016 17:29<br><br>IMAGE GENERATED ELECTRONICALLY FOR WEB FILING<br>THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY |

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| UNITY COURIER SERVICE, INC. | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 3231 Fletcher Drive | Los Angeles | CA | 90065 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| LOPEZ | STEVE | KELLEY | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 14602 Fair Oak Drive | Lake Elsinore | CA | 92530 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
All assets of the Debtor, including all personal property.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions) ☐ being administered by a Decedent's Personal Representative

| 6a. Check only if applicable and check only one box:<br>☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility | 6b. Check only if applicable and check only one box:<br>☐ Agricultural Lien  ☐ Non-UCC Filing |
|---|---|

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
LOPEZ-UNITY

FILING OFFICE COPY

EXHIBIT 9

AT-138/EJ-125

| ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NO.: 295473 | FOR COURT USE ONLY |
|---|---|---|

NAME: Eric S. Trabucco
FIRM NAME: Mallison & Martinez, Attorneys at Law
STREET ADDRESS: 1939 Harrison Street, Suite 730
CITY: Oakland    STATE: CA    ZIP CODE: 94612
TELEPHONE NO.: (510) 832-9999    FAX NO.: (510) 832-1101
E-MAIL ADDRESS: ETrabucco@TheMMLawFirm.com
ATTORNEY FOR (name): Plaintiffs

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA
STREET ADDRESS: 1225 Fallon Street
MAILING ADDRESS:
CITY AND ZIP CODE: Oakland, CA 94612
BRANCH NAME: Rene C. Davidson Courthouse

ENDORSED
FILED
ALAMEDA COUNTY

FEB 15 2017

CLERK OF TANIA PIERCE COURT

By _____ Deputy

PLAINTIFF: Angela Brooks et al.
DEFENDANT: Trans-Box Systems, Inc.

| APPLICATION AND ORDER FOR APPEARANCE AND EXAMINATION | CASE NUMBER: |
|---|---|
| [X] ENFORCEMENT OF JUDGMENT    [ ] ATTACHMENT (Third Person) | JCCP 004691 / RG 08 401461 |
| [X] Judgment Debtor    [ ] Third Person | |

ORDER TO APPEAR FOR EXAMINATION

1. TO (name): Unity Courier Service, Inc.
2. YOU ARE ORDERED TO APPEAR personally before this court, or before a referee appointed by the court, to
   a. [X] furnish information to aid in enforcement of a money judgment against you.
   b. [ ] answer concerning property of the judgment debtor in your possession or control or concerning a debt you owe the judgment debtor.
   c. [ ] answer concerning property of the defendant in your possession or control or concerning a debt you owe the defendant that is subject to attachment.

Date: April 7, 2017    Time: 10:30 a.m.    Dept. or Div.: 21    Rm.:
Address of court [ ] is shown above [X] is: Administration Building, 4th Floor, 1221 Oak Street, Oakland, CA 94612

3. This order may be served by a sheriff, marshal, registered process server, or the following specially appointed person (name):

Date: FEB 15 2017    MORRIS JACOBSON

JUDGE

This order must be served not less than 10 days before the date set for the examination.
IMPORTANT NOTICES ON REVERSE

APPLICATION FOR ORDER TO APPEAR FOR EXAMINATION

4. [X] Original judgment creditor    [ ] Assignee of record    [ ] Plaintiff who has a right to attach order
   applies for an order requiring (name): Unity Courier Service, Inc.
   to appear and furnish information to aid in enforcement of the money judgment or to answer concerning property or debt.
5. The person to be examined is
   a. [X] the judgment debtor.
   b. [ ] a third person (1) who has possession or control of property belonging to the judgment debtor or the defendant or (2) who owes the judgment debtor or the defendant more than $250. An affidavit supporting this application under Code of Civil Procedure section 491.110 or 708.120 is attached.
6. The person to be examined resides or has a place of business in this county or within 150 miles of the place of examination.
7. [ ] This court is not the court in which the money judgment is entered or (attachment only) the court that issued the writ of attachment. An affidavit supporting an application under Code of Civil Procedure section 491.150 or 708.160 is attached.
8. [ ] The judgment debtor has been examined within the past 120 days. An affidavit showing good cause for another examination is attached.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.
Date: February 10, 2017

Eric S. Trabucco
(TYPE OR PRINT NAME)    ▶    (SIGNATURE OF DECLARANT)

(Continued on reverse)

Form Adopted for Mandatory Use
Judicial Council of California
AT-138/EJ-125 [Rev. January 1, 2017]

APPLICATION AND ORDER FOR
APPEARANCE AND EXAMINATION
(Attachment—Enforcement of Judgment)

Page 1 of 2
Code of Civil Procedure,
§§ 491.110, 708.110, 708.120, 708.170
www.courts.ca.gov

1    STAN S. MALLISON (SBN 184191)
       stanm@themmlawfirm.com
2    HECTOR R. MARTINEZ (SBN 206336)
       hectorm@themmlawfirm.com
3    MARCO A. PALAU (SBN 242340)
       mpalau@themmlawfirm.com
4    JOSEPH D. SUTTON (SBN 269951)
       jsutton@themmlawfirm.com
5    ERIC S. TRABUCCO (SBN 29547.,
       etrabucco@themmlawfirm.com
6
7    MALLISON & MARTINEZ
     1939 Harrison Street, Suite 730
     Oakland, California 94612
8    Telephone: (510) 832-9999
     Facsimile: (510) 832-1101
9
     Attorneys for Plaintiffs
10
11            IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

12               IN AND FOR THE COUNTY OF ALAMEDA

13   Coordination Proceeding              )   Judicial Council Coordination
     Special Title (C.R.C. Rule 3.550)    )   Proceeding No. 4691
14                                         )
     UNITY COURIER SERVICE                )   Assigned to Judge Winifred Smith
15   WAGE AND HOUR CASES                  )   Dept. 21
                                           )
16           Coordinated Actions.          )   CLASS ACTION
                                           )
17   Brooks v. Trans-Box Systems, Inc., et al.  )   PROOF OF SERVICE RE: APPLICATION
                                           )   AND ORDER FOR APPEARANCE AND
18      Alameda County Superior Court     )   EXAMINATION
         Case No.: RG 08 401461           )
19                                         )
     Polio v. Unity Courier Service, Inc   )
20                                         )
        San Francisco County Superior Court  )
21       Case No.: CGC-11-511533          )
                                           )
22   Callejo v. Unity Courier Services, Inc.  )
                                           )
23      San Diego County Superior Court   )
     Case No.: 37-2013-00047522           )
24                                         )
25
26
27
28

                         PROOF OF SERVICE

1

**PROOF OF SERVICE**

2

3   STATE OF CALIFORNIA            }
                                   }   ss.
4   COUNTY OF ALAMEDA             }

5

6       I am employed in the County of Alameda, State of California.  I am over the age of 18 and
not a party to the within action; my business address is 1939 Harrison Street, Suite 730, Oakland,
California 94612.

7

8       On February 10, 2017, I served the documents described as:

9       **APPLICATION AND ORDER FOR APPEARANCE AND EXAMINATION**

on *Interested Parties at the following* addresses:

10              **SEE ATTACHED SERVICE LIST**

11   [X]   U.S. MAIL: I am readily familiar with the firm's practice of collection and processing
             correspondence for mailing.  Under that practice it would be deposited with the U.S.
12           Postal Service on that same day with postage thereon fully prepaid at Oakland,
             California in the ordinary course of business.  I am aware that on motion of the party
13           served, service is presumed invalid if postage cancellation date or postage meter date
             is more than one day after date of deposit for mailing this affidavit.

14

15   [ ]   BY PERSONAL DELIVERY: I placed each for delivery in an envelope for personal
             delivery by _____ to be delivered same day.

16   [ ]   BY E-Mail: By transmitting the foregoing documents to the e-mail addresses listed below.

17   [X]   STATE: I declare under penalty of perjury under the laws of the State of California that the
             foregoing is true and correct. Executed on February 10, 2017 at Oakland, California.

18

19

20                                    Paula Sotelo

21

22

23

24

25

26

27

28

                                        2.

                                **PROOF OF SERVICE**

1

## SERVICE LIST:

2

## UNITY COURIER SERVICE
## WAGE AND HOUR CASES

3

4

5    Todd B. Scherwin, Esq.                    Jason A. Geller, Esq.
     tsherwin@laborlawyers.com                 Katarzyna W. Nowak, Esq.
6    Shaun J. Voigt, Esq.                      jgeller@laborlawyers.com
     FISHER & PHILLIPS LLP                     Fisher & Phillips LLP
7    444 S. Flower Street, Suite 1590          One Embarcadero Center, Suite 2050
     Los Angeles, CA 90071                     San Francisco, CA 94111

8

9    **Attorneys for Defendants, Unity        **Attorneys for Defendants, Unity
     Courier Service, Inc. and Ali Sha, 9     Courier Service, Inc. and Ali Sharifi**

10

11   Jeremy Graham, Esq.                       Derek R. Guizado
     Scott Cole & Associates, APC             James Hawkins APLC
12   1970 Broadway, Ninth Floor               9880 Research Drive, Suite 200
     Oakland, CA 94612                         Irvine, CA 92618
13   jgraham@scalaw.com                        Derek@jamesHawkinsaplc.com

14   **Attorneys for Plaintiffs in Polio**    **Attorneys for Plaintiffs in Tong**

15

16   George E. Fleming
     Melisa N. McKellar                        Unity Courier Service, Inc.
17   FLEMING PC                                Agent for Service of Process:
     4225 Executive Square, Suite 200          EDWIN C SCHREIBER
18   La Jolla, CA 92037                        16633 Ventura Blvd, Suite 711
                                               Encino, CA 91436
19

20   **Attorneys for Tim Callejo**

21

22

23

24

25

26

27

28

                              3.

                        PROOF OF SERVICE

EXHIBIT 10

**Unity Courier Service**
**90 day forecast**

| | April | May | June |
|---|---|---|---|
| **Cash Receipts** | $ 3,789,271 | $ 3,841,271 | $ 3,791,271 |
| | | | |
| **Expenses** | | | |
| Wages | 1,467,692 | 1,467,692 | 1,467,692 |
| Taxes | 479,574 | 479,574 | 479,574 |
| Workers Comp | 296,374 | 296,374 | 296,374 |
| Auto Allowance | 598,308 | 598,308 | 598,308 |
| Outside Services | 197,312 | 197,312 | 197,312 |
| Auto Expenses | 219,632 | 225,132 | 232,132 |
| Air Freight | 28,875 | 28,875 | 28,875 |
| Supplies | 3,984 | 3,984 | 3,984 |
| Insurance | 148,187 | 148,187 | 148,187 |
| Office Expenses | 20,687 | 18,720 | 18,720 |
| Postage | 250 | 750 | 250 |
| Utilities | 19,665 | 17,878 | 16,388 |
| Travel | 8,000 | 8,000 | 8,000 |
| Taxes & Licenses | 5,500 | 2,500 | 4,000 |
| Repairs & Maint | 305 | 400 | 600 |
| Medical Insurance | 81,813 | 81,813 | 81,813 |
| General Insurance | 38,485 | 38,485 | 38,485 |
| Rent | 99,091 | 99,091 | 99,091 |
| Supplies | 2,121 | 2,121 | 2,121 |
| Commissions-Camco Resources | 36,251 | 36,251 | 36,251 |
| Interest - S Lopez | 1,698 | 1,643 | 1,698 |
| Legal & Administrative Fee | 20,000 | 15,000 | 25,000 |
| Merchant Fees | 1,850 | 1,525 | 1,640 |
| **Total Cash Disbursements** | **3,775,654** | **3,769,614** | **3,786,494** |
| | | | |
| **Net Cash** | 13,617 | 71,657 | 4,777 |
| **Cumulative Cash** | 13,617 | 85,274 | 90,051 |